Lawrence M. GIBBONS, et al., Plaintiffs,

v.

Christopher S. BOND, et al., Defendants.

No. 81–0313–CV–W–5.

United States District Court,
W. D. Missouri, W. D.

Sept. 1, 1981.

Arthur A. Benson, II, Benson & McKay, Kansas City, Mo., for plaintiffs.

Paul R. Otto, Asst. Atty. Gen., Jefferson City, Mo., for defendants.

## ORDER AND MEMORANDUM

SCOTT O. WRIGHT, District Judge.

The six plaintiffs, members of the Democratic party, have been removed or threatened with removal[1] from their jobs as Branch Managers for the Missouri Department of Revenue by the recently installed Republican Administration headed by the defendants. The plaintiffs allege that the defendants have removed or conspired to remove them from their jobs as Branch Managers in violation of the First, Fifth and Fourteenth Amendments to the Consti-

tution, and Sections 1983, 1985, 1986 and 1988 of Title 42 of the United States Code. Two plaintiffs, Gibbons and Moynihan, request permanent injunctive relief restoring them in their jobs with back pay, and legal relief in the form of compensatory and punitive damages. Plaintiffs McLiney, Miller, Payne and Wren request permanent injunctive relief preventing their threatened dismissal, together with legal relief in the form of compensatory and punitive damages. The defendants raise two alternative defenses in support of their decisions to dismiss each of the plaintiffs from their jobs as Branch Managers. As their first defense, the defendants state that political affiliation was neither the sole nor the substantial motivating cause of defendant James' decision to terminate the plaintiffs. In the alternative, the defendants contend that even if this Court finds that political affiliation was the sole cause, political affiliation is an appropriate requirement for the effective performance of the job of Branch Manager.

Trial was held before this Court on August 17, 1981. After careful consideration of the evidence, the Court finds that, under color of state law, defendant James' decision to terminate the plaintiffs was wholly motivated by the political affiliation of the plaintiffs, that political affiliation is an inappropriate requirement for the effective performance of the job of Branch Manager, that the defendants are to be permanently enjoined from removing the plaintiffs from their Branch Managers' job on account of their political affiliation, that plaintiffs Gibbons and Moynihan are to be reinstated by the defendants, and that the plaintiffs are entitled to their reasonable attorney's fees and expenses.

## FINDINGS OF FACT

1. Christopher S. Bond, running on the Republican Party ticket, defeated former Missouri Governor Joseph P. Teasdale, running on the Democratic Party ticket, in the

---

1. Two plaintiffs, Gibbons and Moynihan, have been replaced and are no longer working as Branch Managers. The effective dates of ter-

mination for the other four have been suspended pending the outcome of this litigation.

general election of November, 1980. Defendant Bond was inaugurated governor on January 12, 1981.

2. Governor Christopher S. Bond appointed Ray James as Director of Revenue on January 12, 1981. Director James was confirmed by the Senate on January 12, 1981.

3. The Director of Revenue has overall management responsibility of the Department of Revenue and reports to the Governor.

4. The Department of Revenue has four operating divisions, each headed by a division director who is appointed by and responsible to the Director of Revenue. One of the four divisions, the Division of Motor Vehicle and Licensing, is composed of three bureaus, each of which is headed by a Bureau Manager and an Assistant Bureau Manager. Of the three bureaus, the Field Services Bureau supervises the Branch Offices which are headed by the Branch Manager.

5. There are twelve branch offices, one located in each of the following areas of Missouri: St. Joseph; Springfield; Columbia; Jefferson City; Independence; Kansas City; Joplin; Ferguson-Florissant (St. Louis County); Rockhill (St. Louis County); Raytown; and two in St. Louis.

6. Each branch office sells titles and licenses for automobiles, trucks, buses and boats, and licenses for individual drivers; collects state sales taxes and fees on those licenses; and coordinates the sale and collection with local and county governmental agencies.

7. In addition to the Branch Manager, the branch offices are staffed with assistant managers, section leader, clerical group leader, clerk and custodial workers. Clerks are classified as clerk, audit clerk or cashier. While all branch offices have a manager and clerks, only some of those offices have employees of the other classifications. Assistant managers, section leader, and clerical group leader are supervisory personnel of a lower classification than manager.

8. The job description, in effect on the day of the trial, requires, in part, that the Branch Manager seek "administrative and policy directions from a superior in the central office" located in Jefferson City. The Job Description is set out fully in the margin.[2]

---

**2.** Branch Manager 0964

DEFINITION

This is administrative and supervisory work of a highly complex nature in which state statutes pertaining to titling and licensing of vehicles and drivers are interpreted and administered.

Employees of this class direct the activities of employees of a branch office in the sale of titles and/or licenses for automobiles, trucks, buses, boats and motors and licenses for individual drivers. This employee directs the collection of sales tax for the state on vehicles. Subjects dealt with are established by law and are highly technical in nature. An employee of this class must communicate with the general public and provide an understanding of difficult matters. The employee personally participates in training employees of a lower class. This employee works independently with administrative and policy direction from a superior in the central office.

*EXAMPLES OF WORK PERFORMED* (Any one position may not include all of the duties listed nor do the listed examples include all tasks which may be found in positions of this class.)

Plans, assigns and directs the activities of employees in a lower supervisory class who coordinate the sale of titles and licenses and the collection of sales tax in a field office.

Interviews applicants for employment and trains employees of a lower class in procedures and practical application of departmental policies.

Analyzes work flow and employee hours spent to produce best production ratio.

Performs public relations duties for the department by communicating with the general public, auto dealers and lending institutions, at times under difficult circumstances.

Answers inquiries from the public on state statutes and departmental policy.

Coordinates activities with local and county governmental agencies, such as law enforcement officials, county assessors and county collectors.

Verifies daily bank deposits with recapitulation reports of transactions performed.

Maintains employee evaluation records, payroll information and other personnel records.

Prepares the budget for the office, with advice from superiors.

Contacts the news media to publicize changes in departmental policies and procedures.

9. On February 7, 1980, former Governor Joseph P. Teasdale submitted Reorganization Plans 1, 2, 3 and 4 by Executive Orders 804, 805, 806 and 807, providing for the application of the merit system for various state employees. Plan 2 concerned the employees of the Division of Motor Vehicle and Licensing and did not exempt branch managers from its provisions. The Missouri General Assembly did not enact these plans.

10. On January 21, 1981, Governor Christopher S. Bond, a defendant in this lawsuit, submitted Reorganization Plan No. 1 of 1981 to the Missouri General Assembly which would provide a system of hiring and retaining employees in the Department of Revenue on a merit basis. The Bond Plan exempted branch managers from its provisions. The General Assembly did not enact the Plan. Branch Managers are not protected by the Merit System statutes of Missouri with respect to discharge from employment.

11. Plaintiff Lawrence M. Gibbons was appointed manager of the Independence branch office May 2, 1977. He was terminated as a branch manager by defendant James by way of a letter dated March 9, 1981. His termination was effective April 17, 1981.

12. Plaintiff Margaret B. Moynihan was appointed manager of the Raytown branch office June 1, 1977. By letter dated March 16, 1981, she was terminated by defendant James. Her termination was effective April 17, 1981.

13. Plaintiff Norma Miller was appointed manager of the Jefferson City branch office on May 18, 1977. By letter dated February 18, 1981, defendant Ray S. James informed her that she would be terminated as a branch manager. The termination was later suspended by James pending the outcome of the present litigation.

14. Plaintiff Mary McLiney was appointed manager of the Kansas City branch office March 16, 1977. By letter dated May 15, 1981, defendant James informed her that she would be terminated as branch manager. The termination was later suspended by James pending the outcome of the present litigation.

15. Plaintiff Melvin E. Payne was appointed manager of the Springfield branch office on June 6, 1977. By letter dated May 21, 1981, defendant James informed him that he would be terminated as branch manager. The termination was later suspended by James pending the outcome of the present litigation.

Summarizes, evaluates or completes records and reports for use in the central office on production, personnel or methods.
Promotes effective working relationship between employees and with the public.
Requisitions, stores and coordinates the use of supplies.
Attends quarterly meetings with other managers and superiors.
Operates office equipment such as typewriter, adding machine and validating cash register.
Performs related work as required.
*REQUIRED KNOWLEDGES, SKILLS AND ABILITIES*
Considerable knowledge of modern office practices and procedures.
Considerable knowledge of business English, spelling and arithmetic.
Considerable knowledge of administrative and supervisory functions.
Knowledge of state statutes pertaining to titling and licensing and sales tax collection.
Knowledge of auditing and accounting procedures.
Ability to supervise collections, transactions and audits of titling and licensing procedures.

Ability to communicate oral and written instructions to employees of a lower class and the general public.
Ability to operate office equipment, including typewriter, adding machine and a validating cash register.
Ability to plan and prepare a budget for the fiscal year.
Ability to train employees of a lower class in all functions and procedures of the office.
Ability to obtain information from and communicate with employees of the same class.
Ability to plan and compose instructional material for use by the media.
Ability to interpret statutes and apply them to the work situation.
*DESIRABLE QUALIFICATIONS*
Knowledges, skills and abilities normally acquired through regular training curriculum, special courses or self-education and experience which is substantially equivalent to a secondary school education and considerable increasingly responsible experience in administrative and supervisory work.

16. Gerald F. Wren was appointed manager of the South Kingshighway branch office in St. Louis, Missouri. By letter dated March 14, 1981, defendant James informed him that he would be terminated as branch manager. The termination was later suspended pending the outcome of the present litigation.

17. When defendant Bond was inaugurated governor on January 12, 1981, plaintiff branch managers were either Democrats who had originally been appointed branch managers under the previously Democratic administration or were persons who had been sponsored by politically active Democrats.

18. All plaintiffs presently consider themselves to be affiliated with the Democratic Party and were supporters of former Governor Joseph P. Teasdale in his bid for reelection in 1980.

19. On April 13, 1981, Shirley A. Ross became manager of the branch office of Independence, Missouri. She was appointed by defendant James, affiliated with the Republican Party and active in Republican politics prior to the time of her appointment.

20. On April 20, 1981, Clarr B. Carter was appointed manager of the Raytown branch office. Beginning in 1975, she had been employed in several capacities at the Raytown branch office, including Assistant Branch Manager and Clerical group leader. She had been retained by the former Teasdale administration.

21. Defendant James plans to replace plaintiff Payne with Donald Hawkins as manager of the Springfield branch office. Mr. Hawkins was active in the gubernatorial campaign of defendant Bond in 1980.

22. Defendant James plans to replace Gerald F. Wren with Vernon Schmidt.

23. Defendant James plans to replace Norma Miller with Dora Dale Mittenberg who has been active in Republican politics.

24. Defendant James is and has been an active Republican for more than seventeen years.

25. Defendant James told *Kansas City Times* Reporter Mark Slinkman that the managers of all 12 branch offices will be replaced solely on account of their political affiliation and that their political firings are permitted by federal court decisions on patronage because the managers hold administrative, policymaking positions.

26. Plaintiff McLiney telephoned defendant James with regard to his statements made to Reporter Slinkman. McLiney was told by James that she was doing a good job. James subsequently terminated her.

27. Defendant James told *Independence Examiner* Reporter Pat Kelly that the decision to fire plaintiff Gibbons and replace him with Shirley Ross was totally political and that Gibbons' performance was not a factor.

28. Defendant James' interview with Reporters Slinkman and Kelly took place approximately one month before this lawsuit was commenced.

29. Each plaintiff was performing his or her job satisfactorily, or better than satisfactorily, under the evaluative standards in force in the Department of Revenue as of the date each received his or her letter of dismissal.

30. Shirley Ross, the person appointed by the defendants to replace plaintiff Gibbons, is currently required to seek permission from her supervisors in order to change the hours in which the Independence branch office is open.

31. The two persons appointed by defendants to replace Gibbons and Moynihan presently operate the branch offices in accordance with procedures followed by branch managers in the previous Democratic administration.

32. Though several branch managers have yet to be evaluated, defendant James has determined that they, too, would most likely be fired because he presumes that they would not be emotionally committed to policies of the newly installed Republican administration, and would not be intellectually and experientially qualified to handle

---

the new duties proposed for the branch manager position.

33. Defendant James inspected the branch offices headed by plaintiffs Gibbons, Moynihan, Payne, Wren and McLiney and briefly interviewed each of them.

34. Defendant James inspected the branch office headed by plaintiff Miller, but did not interview her.

35. Defendant James characterized the six plaintiffs as "creatures" of a "very narrow managerial mode."

36. After each inspection and brief interview, defendant James concluded that each plaintiff met his minimal standards of competence, but that each lacked the "flexibility" to unshackle themselves from their "very narrow managerial mode."

37. The personal inspections and interviews conducted by defendant James took place after this suit was commenced.

38. All plaintiffs are state employees.

39. All persons selected by the defendants to replace the six plaintiffs are affiliated with the Republican party.

40. Plaintiffs' counsel has tried law suits in federal court for thirteen years and is a specialist in civil rights litigation.

41. The customary and reasonable attorney's fee for in-court time is $80 per hour and for out-of-court time is $60 per hour. The customary and reasonable hourly wage for a law clerk is $20 per hour. The customary and reasonable hourly wage for a paralegal is $24 per hour.

42. Plaintiffs' counsel is regarded as an able civil rights litigator in the Western District of Missouri.

43. Plaintiffs' reasonable expenses amounted to $1,121.53.

## CONCLUSIONS OF LAW

1. Defendant James, acting under the color of state law, was motivated in his decision to terminate the plaintiffs wholly on the basis of the plaintiffs' political affiliation.

2. Political affiliation is an inappropriate requirement for the effective performance of the job of Branch Manager.

3. The defendants are permanently enjoined from removing the plaintiffs from their Branch Managers' position on account of their political affiliation.

4. Two plaintiffs, Gibbons and Moynihan, are entitled to reinstatement, but are not entitled to back pay.

5. The defendants are not liable in their official or individual capacities for compensatory or punitive damages.

6. The plaintiffs are entitled to their reasonable attorney's fees and expenses.

## OPINION

### I

In order to resolve the issue of whether the defendants, acting under the color of state law, have removed or threatened to remove the plaintiffs from their jobs as branch managers in violation of the plaintiffs' Constitutional and civil rights, the Court applies a two-tier standard of analysis to the facts presented in this case. Under this two-tier analysis, the Court must initially determine whether defendant James' decision to terminate the plaintiffs was wholly motivated by the political affiliation of each plaintiff. Since the Court ultimately determines that defendant James was wholly motivated in his decision to terminate by the political affiliation of each plaintiff, it must then determine whether political affiliation is an appropriate requirement for the effective performance of the job of branch manager. The Court finds that political affiliation is an inappropriate requirement for the Branch Manager's job.

A. *Tier I*: Motivation Behind Decision to Terminate.

Both parties agree that defendant James' decision to terminate the plaintiffs was made in accordance with the management responsibilities imposed on him by state law as the Director of Revenue. *Cf. Mayhugh v. Bill Allen Chevrolet*, 371 F.Supp. 1 (W.D.Mo.1973), *aff'd*, 496 F.2d 16

(8th Cir. 1974) (establishing state action standards under 42 U.S.C. § 1983). In addition, the defendants agree that each plaintiff enjoys the concrete rights of freedom of political belief and of political association which constitute the core of activities protected by the First Amendment as it is applied to state action through the Fourteenth Amendment. *Board of Education v. Barnette*, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943). Thus, having established state action, the first tier of inquiry is whether the plaintiffs were terminated by the defendants wholly on the basis of the plaintiffs' political affiliation. *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

The evidence presented in this case vividly demonstrates that the plaintiffs were removed or threatened with removal from their jobs as branch managers wholly on the basis of their political affiliation. All of the plaintiffs are presently affiliated with the Democratic party and supported former Missouri Governor Joseph Teasdale in his unsuccessful bid for reelection. Each served as a Branch Manager under the previous Democratic administration. All of the persons presently selected to replace the plaintiffs are affiliated with the Republican Party.

The motivation underlying defendant James' decision to terminate the plaintiffs is amply illustrated by his conversations with two newspaper reporters. James told Mark Slinkman, a *Kansas City Times'* reporter, that the managers of all twelve branch offices would be replaced solely because of their political affiliation.[3] Though defendant James denies making the statement to Slinkman, the Court credits Slinkman's testimony that he accurately quoted James. James also told Pat Kelly, a reporter for the *Independence Examiner*, that the decision to fire plaintiff Gibbons was "totally political" and was not based on Gibbons' performance.[4] Though James disputed the use of the word "totally," the Court credits Kelly's testimony that James used the word "totally" or some other word that conveyed the same meaning.

The Court is convinced that James did not base his decision to terminate the plaintiffs on any factor other than political affiliation. While the newspaper quotes suggest James' state of mind as of March 17, 1981, other evidence demonstrates that factors other than political affiliation were not considered until after this suit was commenced. For example, plaintiff McLiney telephoned defendant James soon after his comments were published in the *Kansas City Times*. James assured McLiney that she was doing a good job, but terminated her soon after their conversation. Though James cursorily inspected the six branch offices and conducted perfunctory interviews of five of the plaintiffs, none of the inspections or interviews took place until after this suit was commenced. The performance of each of the plaintiffs had been evaluated as satisfactory, or better than satisfactory, by the Bureau Manager of the Department of Revenue. James agreed with the evaluations of the Bureau Manager, but testified that the evaluations were based on standards that James intends to change. However, on the day of trial, James had not yet instituted any new standards; consequently, the plaintiffs were performing satisfactorily under presently existing standards.

James testified that, beginning with the new Republican administration, Branch Managers will be required to provide advice to the policy-makers in the central office, assist in the formulation of policy, inter-

---

3. "James said the managers of all 12 branch offices across Missouri, including the one in downtown Kansas City, will be replaced solely because of their political affiliation.

"He said political firings of those Teasdale holdovers are permitted by federal court decisions on patronage because the managers hold administrative, policymaking positions." *Kansas City Times*, March 17, 1981.

4. "James said the decision to fire Gibbons and the subsequent appointment of Ross was totally political. Gibbons' performance was not a factor." *Independence Examiner*, March 17, 1981.

view and hire new employees, handle the discipline of branch office employees and serve as spokespersons for the Department of Revenue. Though there is no evidence to suggest that the plaintiffs were measured against this tentative job description when the initial decision to terminate them was made, James stated that he was convinced, after his brief visits to their respective branch offices, that the six plaintiffs were not capable of handling these new responsibilities. James characterized each plaintiff as a "creature" of the "very narrow managerial mode" fostered by the previous Democratic administration and testified that each lacked the requisite "emotional commitment" to the success of the new Republican administration. Though the Court was not favorably impressed by James' characterization of the plaintiffs, it might overlook his indignant reference if the defendants had introduced some credible evidence of the plaintiffs' deficiencies. None was introduced.

The great weight of the evidence supports the proposition that the plaintiffs were removed or threatened with removal from their branch managers' jobs because of their political affiliation. Thus, the defendants have failed to convince the Court that their decision to terminate the plaintiffs was not wholly motivated by the plaintiffs' political affiliation. Having concluded under the first tier of inquiry that the decision to terminate was wholly based on political affiliation, the Court must now determine under the second tier of inquiry whether the defendants have demonstrated that political affiliation is an appropriate requirement for the effective performance of the branch manager's job. *Branti v. Finkel*, 445 U.S. 507, 517–518, 100 S.Ct. 1287, 1294–1295, 63 L.Ed.2d 574 (1980).

B. *Tier II*: Political Affiliation as an Appropriate Requirement.

■ Having failed to persuade the Court that the plaintiffs were not terminated wholly because of their political affiliation, the defendants, in order to prevail in this action, must demonstrate that political af-

filiation is an appropriate requirement for the effective performance of the job of Branch Manager. *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980). *Cf. Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion). Both opinions in *Elrod* and the opinion in *Branti* recognize that party affiliation may be an acceptable requirement for some types of government employment. Consequently, if a government employee's political beliefs or political associations interfere with the discharge of his public duties, his First Amendment rights may be forced to yield to the state's compelling interest in maintaining governmental effectiveness. *Branti, supra*, 445 U.S. at 517, 100 S.Ct. at 1294 (citing *Elrod*); *Elrod, supra*, 427 U.S. at 366, 96 S.Ct. at 2686.

■ This Court must determine if political affiliation is an appropriate requirement for the branch manager's job. Though the *Branti* court reshaped the *Elrod* test, which had required an analysis based upon the "confidential" and "policymaking" nature of the job in question, so that the state's need for favorable "political affiliation" could be determined from a far broader range of circumstances, the *Branti* court, nonetheless, took into consideration the confidential and policymaking nature of the assistant public defender position. *Branti, supra*, 445 U.S. at 519, 100 S.Ct. at 1295. Thus, this Court, in applying the facts of this case to the standard set down in *Branti*, looks not only to the confidential and policymaking nature of the branch manager's position, but also to the totality of circumstances which might suggest that political affiliation is an appropriate requirement for the job of branch manager.

The evidence presented in this case clearly demonstrates that the political affiliation of a branch manager is an inappropriate measure of the effectiveness of his performance. The Branch Managers presently supervise wholly administrative functions. Their job description requires them to seek "administrative and policy direction from a superior in the central office" which is lo-

cated in Jefferson City. Though defendant James purportedly intends to rewrite the job description, so that Branch Managers will shoulder some of the burdens of policy formulation, his plans· are only tentative. In fact, the person who replaced plaintiff Gibbons as the Independence Branch Manager is required presently to seek approval from the central office with respect to the hours the office is to be open to the public. The defendants failed to introduce any evidence which exemplified the "confidential" and "policymaking" nature of the branch manager position. The defendants might someday revise the job description of the Branch Manager; but until that day arrives, the Court must judge the nature of the Branch Manager's job as it exists.

Just as there is no evidence supporting the "confidential" or "policymaking" nature of the Branch Manager position, there is no evidence of other circumstances which suggest that political affiliation is an appropriate requirement. As the district court observed in the *Branti* litigation, it is difficult to formulate any justification for tying either the selection or retention of Branch Managers to their political affiliation. *Branti, supra,* 445 U.S. at 520, n.14, 100 S.Ct. at 1295, n.14 (citing *U.S. Industries, Inc. v. Gregg,* 457 F.Supp. 1293, n.13). Branch Managers direct the sale of titles and licenses in the Bureau of Motor Vehicle and Licensing. Their office duties include, among others,[5] supervision and evaluation of employees, preparation of an office budget, requisition of supplies and communication with the public. These are tasks which can be performed by competent Republicans, Democrats, or other persons not similarly aligned. Though defendant James stated that Branch Managers must be "emotionally committed" to the policies of the new Republican administration, the defendants did not introduce any credible evidence which showed that the plaintiffs lacked such commitment or that the plaintiffs' purported lack of commitment hampered the delivery of branch office services

to the public. For these reasons, the Court is compelled to conclude that political affiliation is not now an appropriate requirement for the effective performance of the job of Branch Manager and that, as a consequence, the plaintiffs were removed or threatened with removal from their Branch Managers' jobs in violation of their First Amendment rights.

## II.

The plaintiff's right to free political belief and political association has been abridged by the defendants in violation of the First Amendment and Section 1983.[6] All six plaintiffs seek compensatory and punitive damages, and an award of their reasonable attorney's fees and expenses. Four of the plaintiffs also request that the defendants be permanently enjoined from removing them from their Branch Manager's jobs on account of their affiliation with the Democratic Party. In addition to the permanent injunction, two plaintiffs, Gibbons and Moynihan, seek reinstatement and back pay, since they were, in fact, removed from their jobs as Branch Managers. For the reasons cited below, the Court enjoins the defendants from removing the plaintiffs from their Branch Manager positions on account of their political affiliation, reinstates plaintiffs Gibbons and Moynihan, and awards each plaintiff his or her respective attorney's fees and expenses. The Court, further determines that the plaintiffs are not entitled to compensatory or punitive damages, and that it cannot award back pay to Gibbons or Moynihan.

### A. *Equitable Relief*

■ Section 1983 of the Civil Rights Acts provides legal and equitable relief for individuals whose constitutional and other civil rights have been violated by a person acting under the color of state law. 42 U.S.C. § 1983. The defendants acted under the color of state law when they removed or threatened to remove the plaintiffs from

---

5. *See,* Job Description, at n.2, *supra.*

6. The Court does not find a violation of 42 U.S.C. § 1985 or § 1986.

their jobs in the Missouri Department of Revenue. *Cf.* Section 32.050.3(2) RSMo. (1978) (Director of Revenue); Article IV, Section 1, Missouri Constitution (Powers of Governor). Since the plaintiffs were removed or threatened with removal in derogation of their First Amendment rights, the defendants are permanently enjoined from terminating the plaintiffs on account of their political affiliation. 42 U.S.C. § 1983. The Eleventh Amendment does not bar injunctive relief against the state, since the relief granted by this Court is wholly prospective. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). As was the case in *Ex parte Young*, executive state officers are enjoined by this Court to conform their future conduct of their offices to the requirements of the First Amendment.

■ Equitable relief under Section 1983 does not encompass an award of back pay to plaintiffs Gibbons and Moynihan. *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974): *Nevels v. Hanlon*, 656 F.2d 372 (8th Cir. 1981). The plaintiffs have asserted that in a civil rights action, back pay is an integral part of equitable relief. In a case cited by the plaintiffs, *Bertot v. School Dist. No. 1, Albany County*, 613 F.2d 245 (10th Cir. 1979), the court awarded back pay against a municipality. Though the plaintiffs contend that an award against a municipality is indistinguishable from an award against the state, their contention, unfortunately,[7] is not the law. A "municipality" has been

characterized as a "person" under Section 1983, while a "state" has not been so characterized. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

In *Nevels v. Hanlon*, the district court had awarded Nevels $47,824.46 as "restitution" for back pay, past vacation benefits, past health insurance premiums, and past life insurance premiums. *Nevels, supra*, at 377. The district court had stated that an award of back pay is "an equitable remedy, representing restitution, rather than damages, and is a liability of the Commissioner of Labor in his official capacity, payable by the state." *Id.* The Eighth Circuit flatly rejected that characterization.[8] *Id.* (citing *Edelman v. Jordan*). Back pay is a monetary award, rather than "equitable restitution." *Id.* at 377. Thus, this Court cannot award plaintiffs Gibbons and Moynihan back pay,[9] because any monetary award, in this case payable out of the state treasury, violates the Eleventh Amendment. *Id.*

B. *Legal Relief*

■ Though the Court has concluded that back pay cannot be awarded against the defendants in their official capacities, and though the plaintiffs have not sought compensatory or punitive damages against the defendants in their official capacities, the defendants, in a proper case, may be liable for compensatory and punitive damages in their individual capacities. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Where damages are sought against the defendants in their indi-

---

7. *See*, Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism*, 89 Harv.L.Rev. 682 (1976); Nowack, *The Scope of Congressional Power to Create Causes of Action Against State Government and the History of the Eleventh and Fourteenth Amendments*, 75 Colum.L.Rev. 1413 (1975).

    *Cf. Whiting v. Jackson State University*, 616 F.2d 116 (5th Cir. 1980), *rehearing denied*, 622 F.2d 1043 (back pay awarded for deprivation of rights under color of state law).

8. The Eighth Circuit did not determine whether back pay might be awarded as an "ancillary

cost of compliance" to the prospective order enforcing federal law, *see*, Hutto v. Finney, 437 U.S. 678, 690 n.15, 98 S.Ct. 2565, 2573 n.15, 57 L.Ed.2d 522 (1978); but because the Circuit Court cited *Edelman* in its *Nevels* opinion, this Court must conclude that back pay is also inappropriate as an ancillary cost of compliance.

9. As of September 4, 1981, plaintiffs Gibbons and Moynihan, respectively, claim $6,053.00 and $6,473.00 in lost wages. The figures represent 20 weeks of salary less unemployment compensation.

vidual capacities, they are protected against money damages if their acts fall within the scope of "official immunity." *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The Eighth Circuit has formulated the *Wood* immunity test in the following manner:

> [D]efendants are not immune from damages if they knew or should have known that the action they took would violate the constitutional rights of plaintiffs or if they took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to plaintiffs . . . .

*Inmates of the Nebraska Penal and Correctional Complex v. Greenholtz*, 567 F.2d 1381, 1384 (8th Cir. 1977) (citing *Wood v. Strickland*, 420 U.S. at 322, 95 S.Ct. at 1001).

With respect to a prima facie defense of official immunity, the defendants must demonstrate that they acted within the scope of their official duties. The defendants established a prima facie defense in that defendant James, Director of Revenue, decided to terminate the six plaintiffs in accordance with authority granted him by the laws of Missouri, Section 32.050.3(2), RSMo. 1978, and because defendant Bond, as Governor, has supreme executive authority over all Missouri state government under Article IV, Section 1, of the Missouri Constitution. The plaintiffs do not dispute that the decisions to terminate them were made by the defendants within the scope of the defendants' official duties.

Once the defendants have established a prima facie case of official immunity, the onus then shifts to the plaintiffs to show either that the defendants acted with a malicious intention to deprive the plaintiffs of their First Amendment rights or that the defendants knew or reasonably should have known that their decision to terminate the plaintiffs would violate the Constitution. *Wood, supra*, 420 U.S. at 322, 95 S.Ct. at 1001. The record is wholly devoid of any evidence which might support a finding that either defendant acted maliciously in his decision to terminate the plaintiffs. Al-

though there was some evidence introduced by the plaintiffs which suggested that defendant James was aware of recent Supreme Court decisions concerning the discharge of state employees in violation of their First Amendment rights, the evidence was insufficient to demonstrate that either defendant knew or reasonably should have known that their decisions to terminate the plaintiffs violated the Constitution. *See, Nekolny v. Painter*, 653 F.2d 1164 (7th Cir. 1981). As the Court's decision in Part I of this opinion indicates, the determination of whether a particular position in state government is protected by the First Amendment presents a difficult factual question. Though the Court ultimately resolved the factual question against the defendants, by finding that political affiliation is an inappropriate requirement for the Branch Manager's job, the Court cannot conclude that defendants knew or reasonably should have known that such a finding was preordained. *Cf. Nekolny v. Painter*, 653 F.2d 1164 (7th Cir. 1981) (appellate court reversed trial court's finding that a senior citizens coordinator was not a policymaker as a matter of law). Therefore, the defendants are not liable in their individual capacities for either compensatory or punitive damages.

### C. Attorneys fees

■ The plaintiffs are entitled to their reasonable attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, since they are the prevailing party in this action. *See, Hutto v. Finney*, 437 U.S. 678, 689–93, n.18, 98 S.Ct. 2565, 2572–75, n.18, 57 L.Ed.2d 522 (1978). The defendants do not challenge the validity of the award under the Eleventh Amendment. *See, Nevels v. Hanlon*, 656 F.2d 372 at 377 n.6 (8th Cir. 1981). They do challenge, however, the amount of fees claimed by the plaintiffs. This Court must take into account twelve factors in determining the proper award of attorney's fees. *Ladies Center, Inc. v. Thone*, 645 F.2d 645, 647–48 (8th Cir. 1981).

The plaintiffs have made application for the following fees:

| | Hours | Fee per Hr. | Total Fee |
|---|---|---|---|
| Attorney: | 84.6 | $80 | $ 6768.00 |
| Law Clerk: | 111.5 | 20 | 2230.00 |
| Paralegal: | 12.0 | 24 | 288.00 |
| | | | $ 9286.00 |

and expenses in the amount of $1,121.53, for a total of $10,367.53. Though the defendants did not introduce any evidence contesting the number of hours alleged by plaintiffs' counsel, they submit that plaintiffs' counsel should be compensated at the rate of $55 per hour for out-of-court time and at a rate of $70 per hour for in-court time, that the law clerk should be compensated at a rate of $8 per hour, and that the paralegal should be compensated at $6 per hour. The defendants also object to $236.24 of expenses. The Court finds that the hourly wage submitted by the plaintiffs with respect to the law clerk and the paralegal is commensurate with law clerk and paralegal fees charged by law firms in the Western District of Missouri. Defendants introduced no evidence to the contrary. With respect to fees charged by the plaintiffs' attorney, the Court finds that his fees must be differentiated by out-of-court and in-court time. The Court records indicate that plaintiffs' counsel spent seven hours in trial or in pretrial conference before this Court. For those seven hours, the plaintiffs' counsel is awarded $80 per hour. For the remaining 77.6 out-of-court hours, the Court considers an hourly rate of $60 to be a reasonable award within the Western District of Missouri. Thus, the attorney's fees should be adjusted from the $6,768.00 claimed to $5,216.00. Finally, the Court considers the amount claimed for expenses entirely proper and, therefore, awards $1,121.53 for expenses. The total award for fees and expenses is $8,795.53.

In determining the amount of the award, the Court has considered (1) the time and labor involved; (2) the novelty and difficulty of the questions presented; (3) the skills required to perform properly the legal services; (4) the exclusion of other employment due to the acceptance of this case; (5) customary fees; (6) the contingent nature of the fees; (7) time limitations imposed by the circumstances; (8) the amount involved and the results obtained; (9) the ability of plaintiffs' counsel; (10) the undesirability of the case; (11) the counsel's professional relationship with the client; (12) and awards in similar cases. *Thone, supra*, at 647–48. With respect to these criteria, the Court particularly notes that plaintiffs' counsel has litigated in federal court for thirteen years, does specialize in civil rights actions, is regarded as an able civil rights litigator and has successfully secured injunctive relief for his clients. In light of all the evidence introduced with respect to attorney's fees and expenses, the Court finds an award of $8,795.53 to be a reasonable award in the Western District of Missouri.

### III.

For all of the reasons advanced above, it is hereby

ORDERED that the defendants be enjoined from removing plaintiffs Payne, McLiney, Wren and Miller from their jobs as Branch Managers in the Missouri Department of Revenue. It is further

ORDERED that plaintiffs Gibbons and Moynihan be reinstated in their jobs as Branch Managers. It is further

ORDERED that the plaintiffs be awarded their attorney's fees and expenses in the amount of $8,795.53 and that the costs of this proceeding be taxed against the defendants.