Eugene H. MITMAN, Jr.

v.

Peter A. GLASCOTT, Esq., Ind. and as Clerk of Courts of the County of Bucks, Elaine P. Zettick, Andrew L. Warren and Carl F. Fonash, Ind. and as Commissioners of the County of Bucks, The Board of Commissioners of Bucks County and The County of Bucks, Pennsylvania.

Civ. A. No. 80–2340.

United States District Court, E.D. Pennsylvania.

Feb. 18, 1983.

Ronald J. Smolow, Trevose, Pa., for plaintiff.

James M. Penny, Jr., Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

Eugene Mitman has sued officials of Bucks County and the county itself alleging that his employment by the county was

terminated because of his affiliation with the Democratic party. The case was tried before me without a jury December 15 through 17, 1982. I now make the following findings of fact and conclusions of law.

### I. Liability

#### A. Conclusions of Law

■ Mitman claims he was discharged from public employment solely because of his membership in the Democratic party. Mitman's political activities are protected by the first amendment. The defendants' actions are clearly under color of state law. Mitman therefore has stated a cause of action under 42 U.S.C. § 1983.

■ The dimensions of Mitman's claim were outlined in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Both opinions showed the Court's concern with "[c]onditioning public employment on partisan support." *Elrod,* 427 U.S. at 356, 96 S.Ct. at 2681. Patronage dismissals essentially force employees to choose between jobs they would otherwise continue to hold and protected political beliefs. *Branti* and *Elrod* make clear that this is impermissible under the first and fourteenth amendments.[1]

■ The more difficult question is the quantum of proof required of plaintiff. Must the political affiliation or nonaffiliation be the sole cause of the dismissal, or is it sufficient that the political posture be a substantial or motivating factor, although not the sole reason? It is true that in *Branti* the Court said, "[t]o prevail in this type of an action, it was sufficient, as *Elrod* holds, for respondents to prove that they were discharged 'solely for the reason that they were not affiliated with or sponsored by the Democratic Party.'" *Branti* 445 U.S. at 517, 100 S.Ct. at 1294, *quoting Elrod,* 427 U.S. at 350, 96 S.Ct. at 2678.

---

1. *Branti* and *Elrod* carved out an exception to this rule for a small class of policymaking, confidential employees. It is conceded that Mitman is not within this class.

However, in *Mount Healthy School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), Doyle sued the school district, claiming that the failure to renew his contract was based upon the exercise of his first amendment rights. The Court found the district court's original analysis inadequate and remanded for a determination of the motivation for the firing with the following guidelines: "Initially . . . the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576 (footnote omitted).

*Mount Healthy* can only be read as not demanding that the political association (or non-association) be the sole factor. I do not believe that *Branti* and *Elrod* dictate a contrary result.

In the first place, the question of "sole cause" versus "substantial or motivating factor" was not before the Court in those cases. Mr. Justice Brennan defined the issue in *Elrod:* "This case presents the question whether the public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments." *Elrod,* 427 U.S. at 349, 96 S.Ct. at 2678.

Both *Elrod* and *Branti* focused on the definition of policy-making positions and not on the quantum of proof.

Of probably more importance is the nature of the freedom involved. If there are degrees of importance among the rights guaranteed by the first ten amendments—and I believe there are—freedom of speech and thought stands pre-eminent as the guarantor of a free democratic society. For example, as our society has evolved and the character of the country has changed, the third amendment prohibiting the quartering of soldiers in private homes has faded into relative inconsequentiality. The first amendment, on the other hand, has grown in its broad protections to the point where an actual interference with freedom of expression is not required to invoke its protections. A mere "chilling effect" is sufficient. *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

A rule that would require proof that political considerations be the sole reason for discharge would significantly narrow the ambit of first amendment guarantees. This is so because of man's inevitable imperfections. I venture to say that there is no human who has not made one mistake or more in the performance of his job. Based upon this quality of human nature, any boss in a political position would never be at a loss to find some error which could be made the basis of a charge of incompetence, a charge which could be asserted as at least a contributing reason for the discharge. Such a resolution would not adequately protect the employee's constitutional rights. "The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of the constitutionally protected conduct." *Mount Healthy City Board of Education v. Doyle,* 429 U.S. at 285–86, 97 S.Ct. at 575.[2] An employee who shows that he or she would not have been fired but for the protected conduct must prevail if the right to engage in that conduct is to be meaningful. I therefore conclude that the only rule consonant with first amendment aims is that stated in *Mount Healthy.*

■ I look to the statement in the same case for the guidelines on the burden and

---

**2.** *Mount Healthy* concerned an employee terminated for exercise of first amendment rights of speech and conduct rather than association or belief. The principles are equally applicable here since "[i]f the First Amendment protects a public employee from discharge based on what he said, it must also protect him from discharge based on what he believes." *Branti* 445 U.S. at 515, 100 S.Ct. at 1293 (footnote omitted).

order of proof: "Respondent having carried that burden [substantial or motivating factor], the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576 (footnote omitted). This is the proper allocation and order of proof in the case before me now. *Nekolny v. Painter,* 653 F.2d 1164 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *McMullan v. Thornburgh,* 508 F.Supp. 1044 (E.D.Pa.), *aff'd,* 671 F.2d 496 (3d Cir.1981), *cert. denied,* 454 U.S. 1147, 102 S.Ct. 1010, 71 L.Ed.2d 300 (1982).

Mitman was not a civil service employee. There is no requirement that Glascott show a reason for his termination. "Even though he could have been discharged for no reason whatever ... he may nonetheless establish a claim to reinstatement if the decision [to fire him] was made by reason of his exercise of constitutionally protected First Amendment freedoms". *Mount Healthy,* 429 U.S. at 283–84, 97 S.Ct. at 574. My inquiry is therefore directed towards Glascott's motivation for firing Mitman. I must determine his intent. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

### B. Findings of Fact

■ The defendants in this case are the current Clerk of Courts for Bucks County (Glascott), the County Commissioners (Zettick, Warren, and Fonash), and the County itself. Glascott, Zettick and Warren are and have been Republicans. Fonash and the plaintiff are and have been Democrats.

In January of 1972, as a result of the elections held the previous November, the Democrats took control of the County Board of Commissioners. In February of that year Mitman was appointed by the Board of Commissioners to a position with the Board of Elections of Bucks County. In the 1975 County election, the Republicans took control of the Board of Commissioners. On January 15, 1976, shortly after the new Board of Commissioners was sworn in, Mitman was dismissed from his job with the Board of Elections. In February, 1976, he was hired by the Clerk of Courts. Richard Hoffman, a Democrat, had been elected Clerk of Courts in the November, 1975 elections.

Hoffman was defeated in the election held in November, 1979, by defendant Peter Glascott. Glascott was sworn into office on January 7, 1980. On January 8, at about 10:00 a.m., Glascott called Mitman to his office and told him he was to be discharged. Mitman had never been reprimanded or disciplined before this date. His personnel file contained no negative reports or evaluations.

On January 17, 1980, Mitman was hospitalized and received treatment for cancer of the colon. Glascott decided to extend Mitman's employment with the County in order that he could continue to receive health benefits. In May of 1980, Mitman advised Glascott that he was recovering and would be able to return to work on June 2, 1980. On May 30, Glascott executed the personnel action form terminating Mitman's employment, effective that day. Before giving Mitman final notice of his termination, Glascott told Mitman to consult Democratic party leaders about obtaining substitute employment with the County.

Between January and June of 1980, Glascott created a new position in the office—administrative assistant. It was initially held by Robert Ferguson, a Republican party worker with no special experience.

James Sloan retired as first deputy in August, 1980. Glascott's predecessor had recommended an experienced office worker, Alyce Deyo, for the post of first deputy. However, she was then a registered Democrat and the Republican Ferguson was appointed instead, leaving vacant the post of administrative assistant.

Glascott hired another inexperienced Republican, Mark Schweiker, as administrative assistant. Eventually he was replaced by Mark Scordia, also a Republican.

Alyce Deyo became first deputy in September, 1981.[3] She had changed her voter registration to Republican in March of that year.

Glascott certainly knew of Mitman's political affiliation. Before he was Clerk of Courts, Glascott had been City Solicitor. In his own word, he considered himself a "politician". In 1979, Mitman met with Glascott to discuss a lawsuit Mitman had filed alleging that his discharge from the Board of Elections in 1976 was motivated by his membership in the Democratic party. In addition, Mitman was an active member of the Democratic party, participating in campaign and support activities. I am convinced that Mitman met his initial burden of showing that his protected conduct was a substantial factor in Glascott's decision. *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

Glascott testified that he fired Mitman because he was incompetent. He testified that in forming his opinion he relied on a report from Mitman's immediate supervisor, James Sloan, on Mitman's participation in a chain of events which led to the release on bail of a convicted first-degree murderer in July of 1979, where bail had not been revoked on the docket, on negative evaluations of Mitman presented by co-workers in conversations with Glascott, on Mitman's failure to provide Glascott with a job description, and on Mitman's interactions with the public at the front counter.

I believe, and I so find, that Mitman's alleged shortcomings in his job as related to Glascott by others, whether true or not, played some part in the decision to fire him. However, I cannot escape the conclusion from the evidence on this record, that politics are a prime consideration for governmental employment in Bucks County. Reflective of this entrenched practice are the following, which I find as facts: the creation by Glascott of an administrative as-

sistant position to be filled by Ferguson, a Republican; the replacement of a Republican by three newly elected Democratic Commissioners to give Mitman a Democratic job in 1972; the rejection of an experienced employee in the Clerk's Office, Alyce Deyo, for the position of first deputy, the appointment of a Republican to the post and Deyo's later appointment after she changed her registration to Republican; Glascott's description of himself as a "politician" and his political position (County Solicitor); Glascott's position as Chairman of the Bucks County Republican Finance Committee; Glascott's familiarity with plaintiff's Democratic activities; Mitman's dismissal in 1976 from the Board of Elections after Republicans assumed control of the Board of Commissioners in the 1975 elections; Glascott's advice to Mitman, at the time of his termination, to consult the Democratic leaders about county employment; and the appointment of an inexperienced Republican as administrative assistant. A final illustration of the significance of political association is that Hoffman, the Democratic Clerk of Courts, who was equally aware as Glascott of Mitman's shortcomings, considered only re-assigning plaintiff; Glascott fired him.

All of these facts lead ineluctably to the conclusion that governmental job tenure depends almost entirely on the ebb and flow of political power. Defendants have not "shown by a preponderance of the evidence that [they] would have reached the same decision as to [plaintiff's employment] even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. I therefore find that plaintiff's political beliefs and activities were substantial and motivating factors in his discharge. Plaintiff is entitled to prevail.

I should emphasize that this opinion is in no way intended to imply that Bucks County is politically any different from the 3133 other counties, divisions, parishes and independent cities in the United States. It simply applies the Supreme Court's abolition of the Jacksonian spoils system.

**3.** The record does not show what happened to     Ferguson.

## II. Damages

█ Mitman is entitled to reinstatement and back pay. It is well settled that the scope of the remedy provided must be tailored to fit the nature and the extent of the constitutional violation. I find the following facts:

Mitman's title was "Second Deputy Clerk of Courts". The work he performed, however, was identical to that performed by two other employees designated as "bookkeepers." I do not doubt that the defendants would have been constitutionally permitted to redesignate Mitman as a bookkeeper and adjust his salary accordingly. He has no constitutional entitlement to either the title or the inflated salary that he received. I will therefore order his reinstatement in the Clerk of Courts Office as a bookkeeper.

Mitman is entitled to receive back pay for the time he was not able to work in the Clerk of Courts office. Again I note that Mitman has not demonstrated any entitlement to the inflated salary he received as second deputy. I will calculate the back pay owed to Mitman on the basis of the salary paid to the bookkeepers performing work identical to Mitman's. In 1980 and 1981 bookkeepers in Bucks County received $8,288. Since Mitman was fired at the end of May, 1980, he is entitled to receive seven-twelfths of the 1980 salary. This is $4,834.69. For 1981 he is entitled to the entire annual bookkeeper's salary. In 1982 bookkeepers in Bucks County received $8,796. Finally, calculating Mitman's award through February 14, 1983, he is entitled to $1,099.50 for lost wages this year. The total of lost wages is $23,018.19.

In addition, Mitman incurred expenses for insurance he would not have incurred had he remained in the Clerk of Courts office. He testified, and I find that he paid $208 bi-monthly for medical insurance. His additional expenses for insurance are therefore $728 for 1980, $1248 for 1981, $1248 for 1982, and $156 for 1983. This totals $3,380 through February 14, 1983. Mitman's total damages are $26,398.19.

Since the theory behind back pay awards is to put plaintiff in the same position he would have been in had he not been fired, the defendants are entitled to reduce damages by the amount that plaintiff has earned elsewhere. Mitman has worked at Brunner Machine Co. since the beginning of 1981. I will reduce the damage award accordingly. I find, however, that while at Brunner, Mitman has worked fifty-hour weeks. To reduce his damage award by the total amount he has earned at Brunner would essentially give the defendant a windfall due to the plaintiff's industriousness. I will therefore reduce the damage award by the amount Mitman would have earned during a forty hour week. (Bookkeepers in the Clerk of Courts Office work a forty hour week.) The adjusted wages earned in 1981 are $5,256.80, in 1982—$9,360, and in 1983—$1,080. This totals $15,696.80 through February 14, 1983. Subtracting the adjusted amounts earned by Mitman at other employment from the damages calculated above, I find Mitman is owed $10,701.39.

I have not reduced the back pay award by the amount of unemployment insurance Mitman received. Whether or not he is obliged to repay this sum to the unemployment compensation fund is a question of state law, controlled by 43 Pa.Stat.Ann. § 847.

Finally, I recognize there may be a delay in Mitman's reinstatement. The damages calculated here are those owed to Mitman as of February 14, 1983. However, the defendants will owe any additional damages, calculated in the same manner as the foregoing, until the time Mitman resumes his employment. At that time plaintiff may file a motion to modify the judgment by the entry of additional damages in the proper amount against the defendant.