John GANNON, Victoria Sierra, Wesley Spraggins, Oscar Nieves and Brenda Perry, Plaintiffs,

v.

Richard M. DALEY, individually and as State's Attorney of Cook County, Illinois, Richard Devine, individually and as First Assistant State's Attorney of Cook County, Illinois, and Cook County, Illinois, a Body Politic, Defendants.

No. 81 C 1512.

United States District Court, N.D. Illinois, E.D.

April 27, 1983.

Robert Boharic, Edward Theobald, Laurence W. Leck, Chicago, Ill., for plaintiffs.

John R. Schmidt, David N. Carvalho, Barbara Bertok, Mayer Brown & Platt, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

In this lawsuit brought under 42 U.S.C. § 1983 (1976) plaintiffs claim that they were fired from their jobs as administrative assistants employed by the State's Attorney of Cook County, Illinois, because of their political affiliation, in violation of their rights under the first amendment[1] and the rule of *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Pending before the court is defendants' motion for summary judgment.

---

1. "Congress shall make no law ... abridging the freedom of speech, or of the press; of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The first amendment is made applicable to the states by virtue of the due process clause of the fourteenth amendment. *See, e.g., Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

Each of the five individual plaintiffs was affiliated with the Republican party. Each was active in the 1980 re-election campaign of the incumbent State's Attorney of Cook County, Bernard Carey, who was a Republican. State's Attorney Carey lost the election, and defendant Richard M. Daley, a Democrat, was elected and became State's Attorney in December, 1980. In early 1981, each of the plaintiffs was fired.

Defendants claim that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law under Fed.R.Civ.P. 56 for three reasons. First, as a matter of law the court should rule that plaintiffs were not fired because of their political affiliation; second, even if plaintiffs were fired because of their political affiliation, they occupied positions where political factors could constitutionally be used as a basis for employment decisions; and third, that defendants have a qualified immunity from suit which operates as a complete defense to this action.

## I

Plaintiffs claim they were fired for political reasons as part of the patronage system in Cook County under which supporters of successful candidates are rewarded with jobs and opponents are punished by losing their government jobs.[2] The parties are in essential agreement that plaintiffs must prove that their political affiliation and activities were a substantial factor in their

dismissals. If they do, the burden shifts to defendants to prove by a preponderance of the evidence that they would have reached the same decisions as to plaintiffs' employment even in the absence of plaintiffs' political affiliation and activities.[3]

Defendants claim that the record does not raise an issue of fact as to whether plaintiffs were fired because of their political affiliation. The record shows that plaintiff John Gannon ("Gannon") worked under State's Attorney Carey as a supervisor of clerical services. Deposition of John Gannon 38. Around the time State's Attorney Daley took office, a decision was made by Michael O'Mara ("O'Mara"), who had been an administrator under State's Attorney Carey, to transfer Gannon to the so-called "IV–D unit", which handles marital and child support matters. Deposition of Michael O'Mara 5, 32. In the IV–D program, Gannon's duties were mostly clerical, which made him by his own admission one of the highest paid members of the clerical staff. Deposition of John Gannon 67–70; *see also* Deposition of Michael O'Mara 81.

During the first months of the new administration, the new first assistant State's Attorney, defendant Richard Devine ("Devine"), conducted a review of the non-legal personnel of the office. Affidavit of Richard Devine ¶ 4. Devine concluded that Gannon was a vastly overpaid and underproductive employee and decided to fire him. *Id.* ¶¶ 6–7. State's Attorney Daley

**2.** The Cook County patronage system is described in *Elrod v. Burns,* 427 U.S. 347, 350–60, 96 S.Ct. 2673, 2678–83, 49 L.Ed.2d 547 (1976) (plurality opinion), and *Shakman v. Democratic Organization of Cook County,* 481 F.Supp. 1315 (N.D.Ill.1979).

**3.** This rule is drawn from *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 574–76, 50 L.Ed.2d 471 (1977), which involved an employee's termination because of his protected speech. *See also Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). Courts have universally held that the *Mt. Healthy* analysis should be used in political affiliation cases. *See Nekolny v. Painter,* 653 F.2d 1164, 1166–68 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Wren v.*

*Jones,* 635 F.2d 1277, 1283 (7th Cir.1980); *Tanner v. McCall,* 625 F.2d 1183, 1195 (5th Cir. 1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Mitman v. Glascott,* 557 F.Supp. 429, 431–32 (E.D.Pa.1983); *Ecker v. Cohalan,* 542 F.Supp. 896, 900 (E.D.N.Y.1982); *Evenson v. Crawford,* 539 F.Supp. 686 (N.D.N.Y.1982); *Visser v. Magnarelli,* 530 F.Supp. 1165, 1169 (N.D.N.Y.1982); *Layden v. Costello,* 517 F.Supp. 860, 862 (N.D.N.Y.1981); *McMullan v. Thornburgh,* 508 F.Supp. 1044 (E.D.Pa.), *aff'd mem.,* 671 F.2d 496 (3d Cir. 1981); *McMahon v. Board of Selectmen,* 506 F.Supp. 537, 541 (D.Conn.1981); *Farkas v. Thornburgh,* 493 F.Supp. 1168, 1174 & n. 19 (E.D.Pa.), *aff'd mem.,* 633 F.2d 209 (3d Cir. 1980), *and aff'd sub nom. Appeal of Farkas,* 642 F.2d 441 (1981); *Aufiero v. Clarke,* 489 F.Supp. 650, 653 (D.Mass.1980).

approved Devine's decision, Affidavit of Richard Daley ¶ 6, and Gannon was fired.

Defendants claim that these facts indicate that Gannon has failed to raise an issue of fact regarding the reasons for his firing.[4] However, Gannon has adduced a number of additional facts. For one thing, Gannon is former State's Attorney Carey's brother-in-law. Affidavit of John Gannon ¶ 5. Moreover, Gannon casts doubt on the allegation that his job performance justified his transfer and subsequent termination by submitting Mr. Carey's affidavit which states that Gannon's performance was satisfactory. Affidavit of Bernard Carey.[5] Most important, Gannon submits evidence that politics were a factor in his dismissal. After Gannon's dismissal, Devine sent a letter to Gannon's counsel in which he observed that Gannon was not protected from political firings under the decree entered in *Shakman v. Democratic Organization of Cook County*, No. 69 C 2145 (N.D.Ill. Jan. 20, 1981).[6] A trier of fact would be entitled to conclude that the reason Devine alluded to the *Shakman* decree in his letter was that political considerations did play a role in Gannon's firing. If they did not, Gannon's exemption from the decree's protections would be irrelevant and there would have been no reason for Devine to mention it in the letter. In addition, Gannon's counsel

claim Devine told them that Gannon was not fired for any disciplinary reasons but simply because the *Shakman* decree permitted State's Attorney Daley to put his "own people" in positions such as Gannon's. Affidavit of Edward R. Theobald ¶ 7; Affidavit of Robert V. Boharic ¶ 7.[7] Devine admits that he alluded to the *Shakman* decree at the meeting. Deposition of Richard Devine 138.[8]

Finally, the report made of Gannon's exit interview by a personnel supervisor indicates that the reason for his termination was not job performance but "change in administration." Plaintiffs' Ex. E.[9] A trier of fact might interpret this phrase to refer to Gannon's political affiliation.

The evidence that defendants justified Gannon's firing with reference to the *Shakman* decree and a "change in administration" creates an issue of fact as to whether Gannon was fired for political reasons.

The remaining plaintiffs, Victoria Sierra, Wesley Spraggins, Oscar Nieves and Brenda Perry, were administrative assistants in charge of community "outreach" offices in four Cook County neighborhoods. The offices had been funded by a grant from the Illinois Law Enforcement Commission which ended in December 1980. Affidavit of Richard Daley ¶ 8. State's Attorney Daley requested that the county fund the pro-

---

**4.** The above facts are presently undisputed.

**5.** Defendants suggest that this affidavit, at best, merely indicates that there is a difference of opinion as to Gannon's performance, and not that O'Mara and Devine did not honestly believe his performance was unsatisfactory. However, if Gannon's performance truly was satisfactory, as the affidavit tends to indicate, then an inference is raised that O'Mara and Devine's decision to fire Gannon rested on grounds other than his job performance, and a trier of fact would be entitled to discredit their post-hoc explanations for the firing. Devine and O'Mara need not admit that the performance rationale for firing Gannon was pretextual for plaintiffs to be entitled to argue pretext on the basis of the testimony of others familiar with Gannon's work.

**6.** Devine's letter is in the pretrial materials as Plaintiffs' Ex. K.

**7.** While defendants have not yet moved to disqualify Messrs. Boharic and Theobald as coun-

sel for Gannon, defendants do point out that there is a likelihood that their continued representation of Gannon may violate ABA Model Code of Professional Responsibility DR 5–102(A) (1982) should they seek to testify in Gannon's behalf or should it appear that they should testify in his behalf. Defendants may be correct. Messrs. Boharic and Theobald should, we think, consider withdrawing as counsel for Gannon if there is a dispute as to what Devine said and the Boharic/Theobald version is material to Gannon's claim.

**8.** Defendants claim Devine merely accurately stated the requirements of *Shakman*. However, they ignore the question, discussed above, why he stated those requirements unless he thought they were relevant to Gannon's termination.

**9.** The report is admissible under Fed.R.Evid. 801(d)(2)(D) and 803(6) & (8).

gram pending an evaluation of its merits and the county agreed to do so. *Id.* ¶ 9. The evaluation was conducted by executive assistant State's Attorney Frank Kruesi, *id.* ¶ 10; Affidavit of Frank Kreusi ¶ 4, who ultimately concluded that the program was ineffective and that a better outreach program could be developed to take its place, *id.* ¶¶ 5–6. The recommendation that the program be defunded and the offices closed was concurred in by Devine, Affidavit of Richard Devine ¶ 14, chief deputy State's Attorney William Kunkle, Deposition of William Kunkle 43–44, 51–52, and ultimately the State's Attorney, Affidavit of Richard Daley ¶ 12. This decision resulted in the termination of the remaining plaintiffs, *id.* ¶ 13. The possibility of using them in a new outreach program was rejected since it was decided that it would be better to staff the new program with new employees committed to the anticipated new program rather than to retain employees who had been part of a program widely regarded as a failure. Affidavit of Frank Kruesi ¶ 10; Affidavit of Richard Devine ¶ 19.

However, plaintiffs have testified that they were told that political considerations entered into their terminations. For example, plaintiff Wesley Spraggins testified that he was told by Glen Carr ("Carr"), an attorney bureau chief for the State's Attorney, that "there were going to be a number of changes made because [plaintiffs], in fact, had supported or were known to be Republicans." Deposition of Wesley Spraggins 25.[10] Soon thereafter, Spraggins and the others were fired. Carr then told him that plaintiffs "were terminated because we were in the wrong political party." *Id.*

at 35. Similarly, Carr told plaintiff Victoria Sierra "your firings and the closings were political in nature." Deposition of Victoria Sierra 92. Carr told plaintiff Brenda Perry and three witnesses,

> I really guess they must have considered you a threat and let you go anyway, but I want you to know I really wanted to see you stay, but sometimes that's the way it goes in politics.

Deposition of Brenda Perry 80–81. Plaintiff Oscar Nieves was told by Irene Hernandez, a Daley supporter and a Commissioner of Cook County, that he would lose his job if he did not support State's Attorney Daley in his election campaign. Deposition of Oscar Nieves 54.

In addition, the termination interview reports for these plaintiffs indicate that the reason for their termination was "change in administration" or "administrative changes" rather than "reduction in force" or "discontinuation of function." Plaintiffs' Ex. E–H.

 This evidence raises an issue of fact as to whether plaintiffs were fired for political reasons. Defendants do not dispute that Carr and Hernandez made the statements attributed to them, arguing instead that Carr and Hernandez did not actually know why plaintiffs were terminated. Carr said as much at his deposition. *See* Deposition of Glen Carr 60–61. However, a trier of fact might infer that Carr's statements to plaintiffs were based on personal knowledge, and discredit Carr's contrary testimony as motivated by a desire to protect his superiors.[11] The exit reports too tend to show that plaintiffs were terminated for political reasons.

---

**10.** To similar effect, *see id.* at 29 (Carr told Spraggins that "decisions were being made by Mr. Daley, Mr. Devine, and Mr. Kreusi, and that he was sure that people were going to be terminated based on their political involvement.").

**11.** Carr's statements are admissible to prove the truth of the matters asserted therein. Statements of an agent concerning a matter within the course of his employment may be admitted to prove the truth of matters asserted therein under Fed.R.Evid. 801(d)(2)(D). It is undisputed that Carr was defendants' agent when he made the statements, and there is

evidence indicating that his duties included evaluating the community offices and making recommendations about the personnel at those offices. Deposition of Glen E. Carr 19–23, 52. Hernandez was an agent of defendant Cook County. Thus, these statements are some evidence as to why plaintiffs were terminated. Defendants have submitted evidence tending to show Carr and Hernandez did not know why plaintiffs were terminated, but this contrary evidence merely creates an issue of fact, it does not entitle defendants to judgment as a matter of law.

■ It is true that if plaintiffs were to be terminated irrespective of political considerations because of a reduction in force, defendants would prevail.[12] However, plaintiffs have succeeded in raising an issue of fact as to whether defendants' claimed reduction in force was pretextual. The exit reports permit a trier of fact to infer that the reduction in force was not the reason for plaintiffs' termination. Also, while defendants' good faith judgment that plaintiffs would not be committed to a new outreach program would be constitutionally firm,[13] plaintiffs have submitted deposition testimony indicating that they were never considered at all for positions in the new outreach program. *See* Deposition of Richard Devine 260; Deposition of Eileen Springer 46; Deposition of Richard Daley 94–96. This material would entitle a trier of fact to infer that defendants' claim that plaintiffs would not have been suitable as employees in a new outreach program is pretextual. Coupled with the statements of Carr and Hernandez, this material raises an inference that the offices were closed, and plaintiffs not considered for other positions, because of their political affiliation.[14]

In sum, defendants and their agents have made statements, admissible for their truth, indicating that plaintiffs were dismissed for political reasons. These statements are sufficient to create an issue of fact as to why plaintiffs were fired.[15]

---

**12.** *See Wren v. Jones,* 635 F.2d 1277 (7th Cir. 1980), *cert. denied,* 454 U.S. 832, 102 S.Ct. 129, 70 L.Ed.2d 110 (1981); *Tanner v. McCall,* 625 F.2d 1183, 1195–96 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Soileau v. Zerangue,* 553 F.Supp. 845 (W.D.La.1982); *Evenson v. Crawford,* 539 F.Supp. 686, 690 (D.N.D.1982); *Goldberg v. Village of Spring Valley,* 538 F.Supp. 641 (S.D.N.Y.1982).

**13.** An employee may constitutionally be terminated because of fears that the employee does not share the new administration's policy goals and that this will impact on the employee's performance. *See Yeghiayan v. United States,* 649 F.2d 847, 853–54 (Ct.Cl.1981).

**14.** Defendants appear to concede that they are not free to eliminate a unit for the purpose of terminating Republican employees. Neither are they free to refuse to consider transferring

## II

Defendants claim that plaintiffs occupied the type of positions for which employment decisions may be made on the basis of political factors. Our consideration of the question whether plaintiffs are protected from termination on the basis of political affiliation and activities is controlled by *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

In *Branti,* a number of assistant public defenders were fired because of their political affiliation. In determining whether these employees could constitutionally be fired on this basis, the Court rejected as a test whether the employees' jobs were policymaking or confidential in character. The Court noted that discharge of a Republican election judge for changing his party affiliation surely would be constitutionally permissible, while discharge of a state university's football coach on the same basis would not, even though the former's job is not confidential or policymaking, and the latter's is. *See* 445 U.S. at 517, 100 S.Ct. at 1294. The test the Court adopted

> is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

---

the old employees into a new unit solely on the basis of political affiliation. If a new administration were free to reorganize its departments and refuse to consider hiring incumbent employees for the new departments solely because of their political affiliation, the protections the first amendment offers would be eviscerated.

**15.** We are not the first court to hold that statements by a defendant's agent that plaintiffs were fired for political reasons are sufficient to create an issue of fact that should be decided at trial. *See Nekolny v. Painter,* 653 F.2d 1164, 1168–69 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Visser v. Magnarelli,* 530 F.Supp. 1165, 1170 (N.D.N.Y.1982); *Gibbons v. Bond,* 523 F.Supp. 843, 850 (W.D.Mo.1981), *aff'd,* 668 F. 967 (8th Cir.1982). *See also Mitman v. Glascott,* 557 F.Supp. 429, 433 (E.D.Pa.1983).

*Id.* The Court went on to hold that since an assistant public defender's role is to represent clients and not any partisan political interest, party affiliation was not an appropriate requirement for that job and could not constitutionally be the basis for dismissal.

Because of the vagueness of the *Branti* standard, defendants suggest more specific tests for its application here. Specifically, defendants cite *Nekolny v. Painter,* 653 F.2d 1164, 1169–70 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), for the proposition that where an employee has meaningful input into governmental decisionmaking on issues where there is room for principled disagreement on goals or implementation, political factors may constitutionally be weighed in making employment decisions. But *Nekolny*'s holding must be read in light of its underlying rationale, that governmental employees can be dismissed on political bases where their retention creates a danger that a new officeholder's policies may be undercut. *See id.* (citing *Elrod v. Burns,* 427 U.S. 347, 367, 96 S.Ct. 2673, 2686–87, 49 L.Ed.2d 547 (1976) (plurality opinion)). Accordingly, *Nekolny* requires not only that defendants demonstrate that plaintiffs had meaningful input into decisionmaking but also that they had the *type* of input that jeopardized the ability of the new State's Attorney to run his office. If plaintiffs did not have this type of input, their dismissal was unnecessary to vindicate the legitimate interest in efficient public administration and hence is constitutionally infirm.[16]

■ The *Branti* test has been variously stated. Some state that political terminations are permissible where the employee exercises the type of discretion which requires political sympathy with the goals of the incumbent administration. *See Brunton v. United States,* 518 F.Supp. 223, 238–40 (S.D.Ohio 1981).[17] Others state that the political termination is permissible where the employer should expect the cooperation of a loyal and trusted partisan in the position in question. *Ness v. Marshall,* 660 F.2d 517, 521–22 (3d Cir.1981). In the final analysis, however, we think the test must be applied with reference to its ultimate aim of vindicating the interest in efficient public administration. Where an employee exercises the type of discretion that can be used to thwart the partisan goals of the incumbent administration, the employee is subject to dismissal on the basis of political affiliation.[18] This standard is consistent with *Nekolny,* which states that *Branti*'s protections must not thwart the "ability of the government to implement the will of the people," 653 F.2d at 1170.

■ In applying *Branti,* therefore, we look to the character of the discretion plaintiffs exercised. Where an employee's discretion is sufficiently cabined so that his or her meaningful policy and administrative guidance comes from superiors, the Constitution prohibits political dismissals. *See*

**16.** To hold that wherever employees have input into governmental decisionmaking they may be dismissed on partisan bases without inquiry into the type of threat that input poses would be to contravene *Branti*'s admonition that mere involvement in policymaking does not permit dismissal for political reasons unless it is also shown that these reasons are appropriate criteria for judging the effectiveness of the employee's performance of the policymaking work at issue.

**17.** Defendants rely on *Brunton,* which permitted political considerations to enter into the firing of state directors of the Farmers Home Administration. However, these directors were responsible for allocating funds amounting to millions of dollars to competing projects, provided the national office with input on the operation of programs, and represented the agency in each state. Moreover, the agency relied heavily on the advice of its state directors, who were close to local needs. The directors' discretion was much broader than that accorded plaintiffs, as will become evident below.

**18.** *See Elrod v. Burns,* 427 U.S. 347, 367–68, 96 S.Ct. 2673, 2686–87, 49 L.Ed.2d 547 (1976) (plurality opinion); *Newcomb v. Brennan,* 558 F.2d 825, 830–31 (7th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); *Alfaro de Quevedo v. De Jesus Schuck,* 556 F.2d 591, 592 (1st Cir.1977); *Joyner v. Lancaster,* 553 F.Supp. 809, 817–18 (M.D.N.C.1982); *Ecker v. Cohalan,* 542 F.Supp. 896, 901–02 (E.D.N.Y. 1982).

*Visser v. Magnarelli,* 530 F.Supp. 1165, 1171 (N.D.N.Y.1982); *Gibbons v. Bond,* 523 F.Supp. 843, 851–52 (W.D.Mo.1981), *aff'd,* 668 F.2d 967 (8th Cir.1982).[19] But discretion must also be examined qualitatively as well as quantitatively. For example, the assistant public defenders in *Branti* exercised substantial discretion, but since that discretion was not appropriately exercised on partisan bases, they were protected from political dismissal.[20]

▮ There is an issue of fact as to whether plaintiffs held jobs for which political affiliation was an appropriate consideration. Defendants themselves claim Gannon's duties were almost entirely clerical, *see* p. 4, *supra;* in fact they justify his dismissal by arguing his responsibilities were not commensurate with his salary. In the position from which he was demoted, he merely supervised clerical personnel. It is difficult to see how these duties appropriately involve partisan considerations. Either typing, filing and the like is done correctly or it is not.

The remaining plaintiffs supervised community offices. Their affidavits indicate that they handled citizens' complaints, assisted witnesses, supervised clerical functions at the offices, and provided the community with information on the operation of the State's Attorney's office, at all times subject to the day-to-day direction of an attorney in charge. *See* Affidavit of Wesley Spraggins ¶¶ 3–4, 6; Affidavit of Victoria Sierra ¶¶ 2–3, 5; Affidavit of Oscar Nieves ¶¶ 2–3, 6. As with Gannon, a trier of fact might conclude that as long as plaintiffs met a politically neutral standard of competence, they would fully meet the requirements of their jobs. Either the information they provided community groups was accurate or it was not; either they were helpful to witnesses and complainants or not. Presumably, victims and witnesses require essentially the same sort of help from both Republican and Democratic State's Attorneys.

On the other hand, it appears that an important part of the duties of Sierra, Spraggins, Nieves and Perry was to represent the State's Attorney in the community. *See* Defendants' Ex. E–G. Since plaintiffs may have a powerful impact on how the electorate views an incumbent State's Attorney, it may be appropriate to consider politics when hiring persons for these jobs. However, this observation merely raises an issue of fact, it does not resolve it.[21] Plaintiffs have submitted a huge volume of evidentiary material from persons familiar with plaintiffs' duties which indicates that political affiliation and activity is not an appropriate consideration for making employment decisions for those jobs. Thirteen administrative assistants in the State's At-

---

**19.** *See also Alfaro de Quevedo v. De Jesus Schuck,* 556 F.2d 591 (1st Cir.1977); *Catterson v. Caso,* 472 F.Supp. 833, 836–38 (E.D.N.Y. 1979).

**20.** Some examples may be helpful. Jobs for which political factors have been held to be appropriate include city solicitor, *Ness v. Marshall,* 660 F.2d 517 (3d Cir.1981); assistant district attorney, *Mummau v. Ranck,* 531 F.Supp. 402 (E.D.Pa.), *aff'd,* 687 F.2d 9 (3d Cir.1982) (per curiam); fee agents who act as independent contractors for the state, *Sweeney v. Bond,* 669 F.2d 542 (8th Cir.1982); deputy parks commissioner with primary responsibility for administration and power to dispense patronage jobs, *Ecker v. Cohalan,* 542 F.Supp. 896 (E.D.N.Y.1982); city corporation counsel involved in political strategy for city, *Bavoso v. Harding,* 507 F.Supp. 313 (S.D.N.Y.1980); captain of police with broad supervisory and policy functions, *Joyner v. Lancaster,* 553 F.Supp. 809 (M.D.N.C.1982). Jobs which have been held to

be protected under *Branti* include branch manager of state revenue department which collects taxes and fees, *Gibbons v. Bond,* 523 F.Supp. 843 (W.D.Mo.1981), *aff'd,* 668 F.2d 967 (8th Cir.1982); deputy sheriff, *Barrett v. Thomas,* 649 F.2d 1193, 1200–01 (5th Cir.1981); assistant director of state division of motor vehicle and driver licensing, *Crisp v. Bond,* 536 F.Supp. 137 (W.D.Mo.1982); superintendent of roads, *Abraham v. Pekarski,* 537 F.Supp. 858, 865 (E.D.Pa.1982).

**21.** Significantly, the court of appeals for this circuit has observed that the question whether political factors may be appropriately considered in making employment decisions for certain jobs will normally be an issue of fact. *See Nekolny,* 653 F.2d at 1169 (citing *Rosenthal v. Rizzo,* 555 F.2d 390 (3d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977)).

torney's office testified to that effect at their depositions. *See* Plaintiffs Response to Defendants Motion for Summary Judgment at 5–15. In fact, State's Attorney Daley himself made the rather remarkable statement that, in his view, political affiliation is an appropriate consideration for only one job in the office: his own. Deposition of Richard M. Daley 81–82. In light of this showing, defendants are not entitled to summary judgment on the issue of whether the first amendment protects plaintiffs from political dismissals.[22]

### III

Defendants renew their reliance on the *Shakman* decree in support of their motion for summary judgment. Their current argument is slightly different than that we rejected in *Gannon v. Daley,* 531 F.Supp. 287 (N.D.Ill.1981), where defendants sought dismissal of the complaints on res judicata grounds. Now defendants appear to concede that *Shakman,* which involved the constitutional rights of voters and candidates to fair elections, was brought on a different cause of action than that asserted here and hence does not bar plaintiffs' claims as res judicata. Defendants contend, however, that since the decree states that the positions plaintiffs held are "such that political party affiliation or considerations are an appropriate requirement for the effective performance of the positions," the decree has decided the exact question we face here under *Branti* so that plaintiffs are precluded from relitigating that issue by collateral estoppel.

Defendants' argument has two flaws in it. First, defendants overlook the fact that the *Shakman* decree was a consent judgment. Under general principles, an issue is not foreclosed by collateral estoppel unless it has been actually litigated. *E.g., Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466, 469–70 (7th Cir.1982). Consistent with this principle and the recognition that because consent judgments which are not the product of full adversarial litigation may be less reliable than other judgments, the modern trend is not to apply collateral estoppel to consent judgments and to only preclude relitigation of issues the parties have expressly agreed not to relitigate. *See, e.g.,* Restatement Second of Judgments ¶ 27 comment e (1981); 1B J. Moore & T. Currier, Moore's Federal Practice ¶ 0.444[3] (1982); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4443 (1981). The Supreme Court adopted this rule in *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), where it refused to give collateral estoppel effect to a consent judgment.

> It is of course true that the 1943 [consent] judgment dismissing the previous suit "with prejudice" bars a later suit on the same cause of action. It is likewise true that the judgment was unaccompanied by findings and hence did not bind the parties on any issue ... which might arise in connection with another cause of action.

*Id.* at 327, 75 S.Ct. at 868 (footnotes omitted).

---

**22.** Defendants never specifically deny that the named plaintiffs' specific duties did not appropriately involve political considerations. Instead, they correctly observe that the *Branti* test must be applied to a generic position, rather than the duties of a particular occupant of the position, since an incumbent officeholder may wish to use a given position in different ways, *see Ness v. Marshall,* 660 F.2d 517, 522 (3d Cir.1981); *Mummau v. Ranck,* 531 F.Supp. 402, 405 (E.D.Pa.), *aff'd,* 687 F.2d 9 (3d Cir. 1982) (per curiam); and then argue that the generic position of administrative assistant includes partisan functions. Persons holding the title of "administrative assistant" perform varied duties ranging from speechwriting, developing programs, legislative relations and budget planning, *see* Affidavit of Richard M. Daley Ex.

A, to the duties plaintiffs performed. This wide-ranging description convinces us only that in the State's Attorney's office the title "administrative assistant" has no functional significance. The jobs it encompasses are so varied that it means virtually nothing to have that title. *Branti* is concerned with function, not label. If a particular job title involves no functional core of activity, that title should be ignored. To hold otherwise would be to permit an officeholder to entirely avoid the constitutional limitations of *Branti* by giving all his employees the same job title. Our view of this matter is confirmed by common experience, which teaches that the title "administrative assistant" is one of the most often used and least meaningful labels in the parlance of the modern office.

■ The *Shakman* decree too is "unaccompanied by findings." It merely states a naked legal conclusion about certain "exempt" positions which is unsupported by any findings about the duties performed by persons holding those positions. Nor does it contain any agreement precluding relitigation of this issue.[23] Judge Bua himself has indicated that his understanding of the decree is that it permits a discharged public employee who holds an exempt position under the decree to relitigate the propriety of the exemption in a subsequent § 1983 case. *See Shakman v. Democratic Organization of Cook County,* No. 69 C 2145, slip op. at 4 (N.D.Ill. Mar. 3, 1981) (*In re Howarter*). Thus, this aspect of the *Shakman* decree should not receive collateral estoppel effect.

Second, it is not clear that *Shakman* decided the same issue we are faced with here. As we pointed out in our earlier opinion, when Judge Bua originally granted summary judgment in *Shakman,* he expressly declined to permit the *Shakman* plaintiffs to assert the first amendment rights of public employees, holding that those rights were not at issue in *Shakman.* *See* 531 F.Supp. at 290. Thus, *Branti* does not dictate the controlling standard for *Shakman.* In fact, when the decree on which defendants rely was presented to Judge Bua, he questioned, in his oral remarks of November 5 and 21, 1980, whether it complied with *Branti,* and that question was never resolved prior to the entry of the decree. Moreover, Judge Bua has indicated that where the parties have specifically agreed to exempt a position from the protection of the decree, he does not review their decision under *Branti.* In *In re Howarter,* a public employee occupying an exempt position under a consent decree covering the Illinois Attorney General's office sought to have the *Shakman* decree modified to conform with *Branti.* Judge Bua refused to do so.

Because the First Amendment rights of public employees are not directly involved in *Shakman,* the decision of the United States Supreme Court in *Branti v. Finkel,* which concededly does expand the First Amendment protections afforded such employees, would mandate modification of the [ ] Consent Judgment only if the requested change was necessary to provide sufficient protection to the *Shakman* plaintiffs. Those plaintiffs, however, when they agreed to the [ ] Consent Judgment, made it clear that, even with the exemptions specified therein, their Constitutional rights were adequately protected. That being true, the court does not believe that *Branti v. Finkel* can properly be read as requiring modification of the [ ] Consent Judgment.[2]

---

[2] The court agrees with petitioner Howarter that, had there been no Consent Judgment with respect to the position occupied by him, the standard enunciated in *Branti v. Finkel . . .* would be the most appropriate one to apply when determining whether that particular public employment position should be considered exempt from judicial scrutiny under the [ ] *Shakman* Consent Judgment. Because the Constitutional rights reviewed by the Court in *Branti v. Finkel* were those of a job holder, however, rather than of independent candidates or the electorate, this court believes that the Supreme Court's decision in that case is not so related to the issues in *Shakman* as to, in and of itself, warrant the setting aside of *agreed upon* exemptions and provisions in the [ ] Consent Judgment.

Slip op. at 3 (emphasis in original).[24]

Where, as here, positions were exempted from the protections of *Shakman* by agreement of the parties, Judge Bua does not hold the parties to the *Branti* standard. As a result, we cannot be sure that the decree on which defendants rely is based on *Branti* or merely the agreement of the parties. Because we cannot be sure that *Shakman* decided the same question and applied the same standard as that at issue here, we

---

**23.** If anything, an inference that *Shakman* was intended to permit relitigation is raised by the fact that in the decree the court retained jurisdiction to decide questions that arise under the decree.

**24.** Consistent with the *Howarter* footnote, Judge Bua has applied *Branti* to positions not specifically exempted by agreement of the parties. *See Shakman v. Democratic Org. of Cook County,* 508 F.Supp. 1063, 1067–68 (N.D.Ill. 1981).

cannot give the *Shakman* decree collateral estoppel effect.

But defendants argue that even if we do not give the *Shakman* decree collateral estoppel effect, we should still apply it in the interests of "public policy." If the decree is not applied here, they argue, then public officials will lack clear standards to guide their conduct and will be exposed to "endless relitigation" of the issues they thought had been resolved in *Shakman*.[25]

This court is sensitive to the potential this case has for creating an inconsistency with the *Shakman* decree. *See* 531 F.Supp. at 292 n. 3. However, the "uncertainty" defendants face is no greater than the "uncertainty" created by the *Branti* standard itself and the level of difficulty in predicting which employees are protected from political dismissal under *Branti* is obviously one

the Supreme Court thought tolerable. As far as the specter of "relitigation" goes, for one thing, this question never was "actually litigated" in *Shakman*. For another, since Judge Bua himself envisioned the type of "relitigation" plaintiffs seek here, we can hardly conclude that the import of his decree is to prevent the sort of action plaintiffs have brought.[26]

## IV

The parties agree that defendants are entitled to qualified immunity from liability for damages. Defendants contend that, as a matter of law, plaintiffs have failed to overcome the immunity defense, entitling defendants to summary judgment.[27]

The standard for qualified immunity was set down in *Harlow v. Fitzgerald,* —— U.S.

**25.** To the extent this argument is based on the unfairness of holding public officials liable when they reasonably thought their conduct was proper, we address it in our discussion of qualified immunity below.

**26.** Moreover, defendants have not submitted any affidavits in support of this argument, detailing the disruptions in personnel policy that would result if *Shakman* were not applied here. We think it unwise to attempt to determine whether "public policy" supports defendants without a detailed factual showing.

**27.** The limitations of the immunity defense should be noted at this juncture. Defendant Cook County, as a municipal entity, does not possess a qualified immunity. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Also, defendants have no immunity with respect to plaintiffs' prayer for injunctive relief in the form of reinstatement. Qualified immunity is inapplicable to requests for injunctive relief. *See Wood v. Strickland,* 420 U.S. 308, 314 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975); *Rodriguez v. Board of Educ.,* 620 F.2d 362, 366 (2d Cir.1980); *Jacobson v. Tahoe Reg. Planning Agency,* 566 F.2d 1353, 1366 (9th Cir.1977), *aff'd in part and rev'd in part sub nom. Lake Country Estates, Inc. v. Tahoe Reg. Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *Stanford Daily v. Zurcher,* 550 F.2d 464, 465 (9th Cir.1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *Rowley v. McMillan,* 502 F.2d 1326, 1330–32 (4th Cir. 1974); *National Treas. Employees Union v. Nixon,* 492 F.2d 587, 609 (D.C.Cir.1974); *Eslinger v. Thomas,* 476 F.2d 225, 230 (4th Cir. 1973); *Safeguard Mut. Ins. Co. v. Miller,* 472

F.2d 732, 734 (3d Cir.1973); *Soto v. Chardon,* 514 F.Supp. 339, 350–52 (D.P.R.1981), *rev'd on other grounds sub nom. Fernandez v. Chardon,* 681 F.2d 42 (1st Cir.), *cert. granted sub nom. Chardon v. Soto,* —— U.S. ——, 103 S.Ct. 339, 74 L.Ed.2d 382 *and cert. denied,* —— U.S. ——, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982); *Martin v. Wray,* 473 F.Supp. 1131, 1138 (E.D.Wis.1979); *Craig v. Carson,* 449 F.Supp. 385, 397 (M.D.Fla. 1978); *Saffron v. Wilson,* 70 F.R.D. 51 (D.D.C. 1975); *Demkowicz v. Endry,* 411 F.Supp. 1184, 1191 (S.D.Ohio 1975); *Hogge v. Hedrick,* 391 F.Supp. 91, 96 (E.D.Va.1975); *Paxman v. Wilkerson,* 390 F.Supp. 442, 446–47 (E.D.Va.1975); *Richmond Black Police Officers Ass'n v. City of Richmond,* 386 F.Supp. 151, 154 (E.D.Va.1974); *Schreiber v. Joint School Dist. No. 1,* 335 F.Supp. 745, 747–48 (E.D.Wis.1972); *Gouge v. Joint School Dist. No. 1,* 310 F.Supp. 984, 990 (W.D.Wis.1970); *Roth v. Board of Regents,* 310 F.Supp. 972, 975 (E.D.Wis.1970), *aff'd,* 446 F.2d 806 (7th Cir.1971), *rev'd on other grounds,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). This case would be an appropriate one for enjoining defendants to reinstate plaintiffs. *See Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (plurality opinion); *Joyner v. Lancaster,* 553 F.Supp. 809, 815 (M.D.N.C.1982); *Gibbons v. Bond,* 523 F.Supp. 843, 852–53 (W.D.Mo.1981), *aff'd,* 668 F.2d 967 (8th Cir.1982); *Kuhlmann v. Bloomfield Institute,* 521 F.Supp. 1242 (E.D. Wis.1981). There is a split of authority as to whether the qualified immunity defense applies to plaintiffs' claim for back pay. *Compare Demkowicz,* 411 F.Supp. at 1191–92 *with Paxman* and *Schreiber.*

——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[28]

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. . . .

The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences."

*Id.* at 2739 (footnotes omitted) (quoting *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967)).[29]

■ No claim is made that plaintiffs' rights under *Branti* were not clearly established as of the time they were dismissed. Indeed, the court of appeals for this circuit has held exactly that. *See Nekolny,* 653 F.2d at 1170–71.[30] Nor is any contention made that defendants could not have been expected to have been aware of the requirements of *Branti.*[31] Defendants do argue, however, that they reasonably believed that they were permitted to fire plaintiffs on political bases. However, as noted above, plaintiffs have submitted ample evidentiary materials that political considerations were not appropriate for the positions plaintiffs held. There is an issue of fact as to whether defendants should have known that the requirements of *Branti* applied to plaintiffs' dismissals.[32]

---

**28.** No contention is made that *Harlow* should not be applied to this case.

**29.** While *Harlow* involved a suit against federal officials instead of a § 1983 suit against state officials, the Court indicated its approach extended to § 1983. *See* 102 S.Ct. at 2738 n. 30. Nothing in *Harlow* changed the general rule that qualified immunity does not apply to prayers for injunctive relief. *See id.* at 2739 n. 34.

**30.** *See also Visser v. Magnarelli,* 542 F.Supp. 1331, 1337 (N.D.N.Y.1982).

**31.** To the contrary, State's Attorney Daley, at his deposition, testified that he believed the law forbids political dismissals of all employees of the State's Attorney's office. Deposition of Richard M. Daley 73.

**32.** *Harlow* seems to hold that the question of qualified immunity will always be a question of law: the judge will determine whether defendants violated clearly established rights. If they did, defendants will obtain summary judgment, if not, the defense will be stricken. However, this case shows that the immunity defense will, even under *Harlow,* sometimes present issues of fact. The *Branti* test is sufficiently vague that sometimes employers cannot be expected to know an employee is protected under *Branti.* If not, the employer could not be expected to know his conduct was illegal and is protected by *Harlow.* Since at present there remain issues of fact as to what the character of plaintiffs' duties were, *see* part II, *supra,* logically there also remain issues of fact as to whether defendants should have known that those

However, defendants also contend that the *Shakman* decree establishes that defendants could not have been expected to know that plaintiffs could not be fired for political reasons, since the decree specifically exempts plaintiffs from its protections. However, this argument has flaws similar to those in defendants' collateral estoppel argument. First, since the *Shakman* decree was a consent judgment, defendants should have known that it would not protect them through collateral estoppel against suits brought by public employees. In fact, Judge Bua said exactly that in his *Howarter* decision, which was issued before plaintiffs were fired. Second, defendants should have known, at least since Judge Bua's 1979 summary judgment opinion, that the rights of public employees were not at issue in *Shakman*. In *Howarter*, Judge Bua specifically indicated that he would not apply *Branti* to exemptions that had been agreed upon by the parties. Thus, defendants should have known that *Shakman* was not an adjudication of plaintiffs' rights under *Branti*, and could not have reasonably relied upon it as a statement of plaintiffs' rights under *Branti*. In sum, by the time plaintiffs were fired, Judge Bua had indicated that *Shakman* was neither an application of *Branti* nor a bar to plaintiffs' assertion of rights under it. If the trier of fact concludes that defendants should have known that plaintiffs' duties were nonpartisan in character, then they should have known that the *Shakman* decree will not protect them.[33]

V

Running throughout defendants' memoranda is the theme that if they are held liable here, the ability of newly-elected officials to overhaul their staffs in order to fulfill campaign promises will be jeopardized. It is certainly true that a fundamental premise of American government is the rule of the majority. But that is not the fundamental premise of American constitutionalism. The Constitution exists not to protect majorities, which usually can take care of themselves, but to protect minorities from the excesses of the majority. The constitutional right to choose one's political associations and exercise one's political beliefs is a precious one, fully secured against majorities precisely to ensure that in the long run political institutions reflect the will of the people. If the trier of fact concludes that politics appropriately entered in plaintiffs' dismissals, defendants will prevail. However, if political considerations were inappropriately employed by defendants, neither the Constitution nor the public interest would be served by permitting politics to replace efficiency, loyalty and merit as the standard by which public employees are judged.

Defendants' motion for summary judgment is denied. Final pretrial conference and trial in accordance with schedule entered this date.

---

duties did not appropriately include political considerations.

**33.** Defendant Cook County, as a municipal entity, has absolute immunity against an award of punitive damages. *See City of Newport v. Fact*

*Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). We therefore strike the claim for punitive damages against Cook County.