**Myrta DeLaCRUZ, Plaintiff,**

v.

**Leslie PRUITT, Individually and as Auditor of Lake County, Indiana; The Office of the Auditor of Lake County, Indiana, a Constitutional Office; and The County Council of Lake County, Indiana, Defendants.**

**Civ. No. H 79–611.**

United States District Court,
N.D. Indiana,
Hammond Division.

Jan. 6, 1984.

John D. Breclaw, Griffith, Ind., for plaintiff.

Ned M. Berbeco, Asst. County Atty., Crown Point, Ind., for defendant Pruitt.

James L. Wieser, Highland, Ind., for defendant County Council.

## MEMORANDUM OPINION AND ORDER

LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. The case deals with alleged violations of the First and Fourteenth Amendments to the Constitution, and 42 U.S.C. § 1983. This court, having considered the entire record and being duly advised, hereby enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## Findings of Fact

Plaintiff, Myrta DeLaCruz, lives in East Chicago, Indiana with her husband, a police officer, and her two children. Defendants are, respectively, Leslie Pruitt, individually and in his official capacity as Auditor of Lake County, Indiana, and County Council of Lake County, Indiana, the governing body of Lake County responsible for wages paid to Auditor's Office's employees. Plaintiff also named as a defendant the office of Auditor of Lake County.

Jurisdiction arises under 28 U.S.C. § 1343(3) and (4). Plaintiff asks for compensatory damages in the amount of $10,797.30 punitive damages, costs, and attorney fees as a proper award for alleged violations of 42 U.S.C. § 1983 caused by the allegedly wrongful discharge of plaintiff by Leslie Pruitt from her job as supervisor of the East Chicago, Indiana branch of the Auditor's Office of Lake County.

Myrta DeLaCruz worked in a number of offices in the Lake County political system prior to taking a position in the Auditor's Office of Lake County, including the North Township Trustee's Office, the Park Department, and the East Chicago Treasurer's Office. DeLaCruz testified she began working for the Auditor's Office in May, 1977. Dr. Jose Arredondo was the Auditor at that time. Plaintiff worked in the Crown Point office until August 1977 when she accepted a transfer to the East Chicago office. She became supervisor of the East Chicago office in September, 1978, a position she held until December 31, 1978. Dr. Arrendondo found her work satisfactory; Mrs. DeLaCruz performed her job well and was not reprimanded or disciplined while working in the Auditor's office.

Leslie Pruitt became a candidate for Auditor of Lake County in the May 1978 primary along with others, including Don Genis, Dr. Arredondo's Chief Deputy Auditor. Mrs. DeLaCruz supported Mr. Genis in the primary. Mr. Pruitt won the primary, became the Democratic candidate for Auditor, and won the November 1978 election. Mr. Pruitt took office January 1, 1979. Mr. Pruitt has sole authority and discretion to hire and fire personnel.

In addition to the main office of the Auditor located in Crown Point, there are three additional branch offices located in Gary, Hammond, and East Chicago. The East Chicago office employs three persons, one of whom is designated the supervisor. The person who is supervisor sits at the first or front desk of three desks located in the East Chicago office. The supervisor is the person who, under normal practice, would be the first person to deal with people coming into the office.

Dr. Arrendondo, in his capacity as Auditor, retitled the position to supervisor. Prior to that change, the position was "more or less head bookkeeping." Transcript at 298. The office, in general, handles East Chicago taxes, adjusting errors, and making settlements, following bookkeeping procedures established by the Auditor. The supervisor is responsible for opening the office each day. The only task the supervisor does that the other women also do not perform is to make routine corrections in the area of tax penalties involving either a mistake on the part of the Auditor's office or a mistake in a name or an address.

The supervisor is authorized by the Auditor to make only those corrections. All other errors cannot be corrected by the supervisor without express authorization from the Auditor. The supervisor has no discretionary authority.

The supervisor has no power or authority to hire and fire and no power to set vacation time for either herself or the other two employees of the branch. She sets no policy or policies regarding the Auditor's office, the East Chicago branch or its operation. The supervisor of the East Chicago branch does not attend or participate in meetings with the Auditor on a regular basis nor does she have regular contact with the Auditor or his Chief Deputy.

The supervisor is paid more than the other two employees of the office. It is her responsibility, in addition to routine corrections of tax statements, to compile

biannual statistical reports on the data of the East Chicago branch office. These reports are compiled and worked on by all three employees although it is the supervisor who actually takes them to the Auditor's office in Crown Point for submission. There was no evidence the supervisor was responsible for any mistakes or irregularities in the bookkeeping or any mistakes of the other employees.

The woman who replaced Mrs. DeLaCruz as supervisor, Maria Elsa Gutierrez, agreed her job is describable as a clerical position with public contact. Mr. Pruitt described the job as, "The supervisor [sic] in all of the offices have always been more or less head bookkeeping positions." Transcript at 298.

Sometime in December 1978 the three employees of the East Chicago branch, including Mrs. DeLaCruz, the supervisor, received application forms from Mr. Pruitt or his office, then the Auditor-elect, to fill out and return. The office was also visited by Pruitt's appointed Chief Deputy Auditor. All three filled out and returned the applications. Mrs. DeLaCruz's application reflected her then current status as supervisor and expressed her desire to continue as supervisor.

On the last working day of 1978, Jacqueline Tansley, one of the three employees of the East Chicago office, received a telephone call. The female caller identified herself only as someone calling from Mr. Pruitt's office. The caller informed Ms. Tansley that she and Vivian Roche were to report for work in 1979 under Auditor Pruitt, but that Mrs. DeLaCruz was not to report to work. Ms. Tansley informed Mrs. DeLaCruz. No explanation of her termination was given at the time although later she was told by another officeholder that it was political.

Although Mr. Pruitt denied any remembrance of ordering such a telephone call, the subsequent events confirm the telephone conversation. Further, employees in the Auditor's office in Crown Point were specifically asked to stay on under Pruitt's term. If an employee was not asked to stay, then the employee was replaced January 1, 1979.

The new supervisor appointed by Mr. Pruitt was Ms. Gutierrez. Ms. Gutierrez worked for Mr. Pruitt in the Sheriff's office. (Mr. Pruitt was Sheriff of Lake County for eight years prior to becoming Auditor.) She had been the secretary for the Detective Bureau in the Sheriff's office. She had thrown several house parties, purchased tickets, and worked on election day for Mr. Pruitt. Mr. Pruitt informed Ms. Gutierrez she would be the supervisor of the East Chicago branch, effective January 1, 1979.

It is Mr. Pruitt's practice to reward individuals who support his political aspirations through time, money and effort on his behalf. Mrs. DeLaCruz did not support Mr. Pruitt in 1978. Mr. Pruitt testified the supervisor's job belonged to no one person until he took office January 1, 1979 and appointed someone to the position.

Mr. Pruitt also testified he planned to replace everyone in the East Chicago office because of alleged irregularities in record-keeping procedures and complaints from the public. Mrs. DeLaCruz was, in fact, the only person replaced although Ms. Tansley was later transferred to the main office.

Mr. Pruitt did not personally know Mrs. DeLaCruz although he did assume she was a supporter of Dr. Arredondo and his chosen candidates by virtue of her employment under Dr. Arredondo. In fact, Mrs. DeLaCruz was an Arredondo supporter and a supporter of Dr. Arredondo's chosen candidate for Auditor in the May 1978 primary, Don Genis. She was not approached by Mr. Pruitt for support nor did she offer support. It is an established fact that the winners of the Democratic primary election for county offices in Lake County, Indiana generally are the winners of those offices in the general election.

Several conversations occurred between plaintiff and Mr. Pruitt or between plaintiff's husband and Mr. Pruitt in the first months of 1979 following plaintiff's termi-

nation. At the first of these conversations, Mr. Pruitt said he had not realized Mrs. DeLaCruz was the East Chicago supervisor, unfortunately, the supervisor position was no longer available. He maintained there were no openings in the Auditor's office, but he would try to find a job for Mrs. DeLaCruz as soon as an opening became available.

Although Mr. Pruitt earlier testified there were no openings in 1979 in the Auditor's office he later testified there was an opening in the Crown Point office in April, 1979. He transferred Ms. Tansley to Crown Point from East Chicago and filled the consequent opening in East Chicago with a woman from East Chicago who had not previously worked in the Auditor's office. Mrs. DeLaCruz was not contacted.

Mr. Pruitt testified he stopped attempting to find Mrs. DeLaCruz a job in East Chicago when he heard she had a job in the Sheriff's office under the new Sheriff, Dr. Arredondo. He assumed the position to be a permanent one.

The job Mrs. DeLaCruz had in the Sheriff's office was temporary. It began in late April or early May and ran for two weeks. She earned $344.00. Her job was that of a file clerk. Plaintiff also received unemployment compensation of $1,188.00. The salary of the supervisor in 1979 was stipulated by the parties to be $9,988.50.

Plaintiff obtained a permanent position at the Jones & Laughlin Steel Corporation, commencing January 4, 1980. Plaintiff's hours and responsibilities were increased from those she had in the Auditor's office. The salary was also increased.

Mrs. DeLaCruz testified she suffered mental and emotional stress in 1979. She saw two physicians for treatment of stress. Further, there was some evidence of financial and marital problems caused by the loss of Mrs. DeLaCruz's job in the Auditor's office and her inability to secure permanent employment until 1980. Such evidence consisted of plaintiff's and her husband's testimony they had problems with creditors and bill collectors and they separated for a time. The husband cashed in a police pension and received $10,000.00.

## Conclusions of Law

### I

Before turning to the dispositive issues of whether plaintiff suffered a deprivation of a constitutionally protected interest and if so, whether the deprivation was caused by official policy, custom or usage of Lake County, *see Powe v. City of Chicago,* 664 F.2d 639, 643 (7th Cir.1981), this court addresses and resolves Lake County Council's motion to dismiss it from this suit.

It is established that a claim against a person in his official capacity is but another form of claim against the governmental entity of which the person is an agent. *Monell v. Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 870 (7th Cir.1983); *Richardson v. City of Indianapolis,* 658 F.2d 494, 501 (7th Cir.1981); *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981). Plaintiff is suing Mr. Pruitt in his official capacity as Auditor of Lake County as well as individually. Thus, plaintiff is also suing Lake County.

■ If Mr. Pruitt is found liable in his official capacity, then Lake County is also found liable. Lake County is officially comprised of two governmental bodies: the Board of Lake County Commissioners and the Lake County Council. Both bodies are liable. Thus, plaintiff has stated a claim against the Lake County Council simply by pleading a cause of action against Mr. Pruitt in his official capacity, without even needing actually to name Lake County Council.

Lake County Council has argued throughout that no claim can be stated against it because it had no direct role in Mr. Pruitt's action. It asserts it is only the fiscal and legislative body of Lake County, providing funds to the Auditor for use in paying his employees. Lake County Council argues the Board of Commissioners is the specific governmental body which would be liable to satisfy a judgment, if

Lake County were to be held liable in this case.

This court took judicial notice of several statutes pertaining to this case. Those statutes are: I.C. 17–1–24–20, 17–1–24–14, 17–1–24–21, and 17–1–24–18.3. These statutes were those in effect in 1979 and have been recodified under Title 36 of the Indiana Code. *See* I.C. 36–2–5–12 [17–1–24–20]; 36–2–5–2 [17–1–24–14]; 36–2–9–14 [17–1–24–21]; and 36–2–5–3, 5–4 [17–1–24–18.3, in part] (Burns Code Ed., Repl.1981). The court also takes judicial notice of I.C. 36–2–2–2 [I.C. 17–1–14–1, 17–1–14–5], I.C. 36–2–2–16 [I.C. 17–1–14–11], I.C. 36–2–3–2 [I.C. 17–1–24–1], I.C. 36–2–3–7(c), (d) [I.C. 17–1–24–6, 17–1–24–6.5], I.C. 36–2–5–7(9) [I.C. 17–1–24–15, 17–1–24–18] (Burns Code Ed., Repl.1981). *See also* I.C. 36–2–3.5–2, 36–2–3.5–3, 36–2–3.5–4, 36–2–3.5–5 (Burns Code Ed., Repl.1981) (definition of powers and duties of county governmental bodies).

■ The statutory scheme of county government organization in Indiana is clearly intended to bifurcate responsibility between a Board of County Commissioners (Executive) and a County Council (Legislative, Administrative). While separate in their powers and functions, the two bodies are interdependent. Together they comprise county government in Indiana. Lake County Council cannot say it is not a governmental body unnecessary to and thus, removable from, this suit against Lake County.

Lake County Council would be the county body, under Indiana law, which would satisfy any judgment against the county through an appropriation of funds. *See*

I.C. 36–2–2–16 (Claims Against County—Raising County Funds), I.C. 36–2–3–7(c), (d) (Emergency Meetings called by County Auditor), 36–2–5–12 (Emergency Appropriations by County Council). Although the Board of County Commissioners could be the body requesting the satisfaction of a judgment,[1] it would be the County Council's responsibility under state law, to satisfy the judgment. Both bodies would be liable because the two, together, comprise the government of Lake County and together carry out the business of Lake County.

■ It does not affect plaintiff's ability to recover if she proves her case, that she named Lake County Council as a defendant. Naming Lake County Council insured that Lake County had notice of the suit and opportunity to be heard. *See Van Ooteghem v. Gray*, 628 F.2d 488, 495–96 (5th Cir.1980) (better practice is to name a county entity as a defendant in 1983 official capacity suits as well as the agent of the county acting in his official capacity). Council's motion to dismiss it as a defendant to this suit is DENIED.[2]

## II

The suit before this court is controlled, in part, by the test enunciated in *Monell v. Department of Social Services*, 436 U.S. at 658, 98 S.Ct. at 2018. *Monell* dictates:

We conclude, therefore, that a local government may not be sued under § 1983 [3] for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmak-

---

1. The statutory scheme apparently envisions the claim would be filed with the County Auditor on forms furnished by the county executive. I.C. 36–2–6–2 (Burns Code Ed., Repl.1981). It is the Auditor who calls emergency meetings, I.C. 36–2–3–7(c), (d) of the fiscal body. It is also the Auditor who keeps the minutes of any executive meetings, I.C. 36–2–2–11 (Burns Code Ed., Repl. 1981), the minutes of any fiscal meetings, I.C. 36–2–3–6, and the minutes of any legislative meetings, I.C. 36–2–4–9. The latter two functions rest in the hands of the County Council.

2. The Lake County Council has not contested the sufficiency of the claim plaintiff raises against the Auditor; it attacked only the basis for the presence of itself in the suit as a named defendant.

3. 42 U.S.C. § 1983 provides:
 Every person who, under color [of state law], subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable ... in an action at law, suit in equity, or other proper proceeding for redress.

ers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* 436 U.S. at 694, 98 S.Ct. at 2037–38 (footnote added).

The suit insofar as it relates to Mr. Pruitt individually, is controlled by the issue of Mr. Pruitt's entitlement to a qualified immunity based on good faith. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), sets out the test:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738. The test is objective. *See also Gannon v. Daley,* 561 F.Supp. 1377, 1387–89 (N.D.Ill.1983). Mr. Pruitt's individual liability will be addressed and determined after addressing the case in the context of *Monell.*

This case, in large measure, turns on the presence of proof on the issues of (1) whether there has been a deprivation of a constitutionally protected interest of plaintiff, and (2) if so, whether the deprivation was caused by an official policy, custom or usage of Lake County. *Monell, supra; Powe,* 664 F.2d at 643.

## A

The issue of a deprivation of a constitutionally protected interest actually involves the resolution of two questions. First, was there a deprivation of a constitutionally protected interest? Second, was the protected interest or conduct the motivating or substantial factor in the action taken (termination) by the defendants?

1. *Deprivation of Constitutionally Protected Interest.*

Mrs. DeLaCruz was terminated as supervisor of the East Chicago, Indiana branch of the Auditor of Lake County's office. At the time, she was given no explanation of the termination. Her work in the position had been satisfactory and she had not been reprimanded or otherwise disciplined for her job performance. Mr. Pruitt replaced the supervisor with a political supporter of his who had previous secretarial service gained working under Mr. Pruitt when he was Sheriff of Lake County, in the Detective Bureau. There is no evidence as to any clerical work experience possessed by the replacement. Mr. Pruitt made a practice of rewarding his political supporters. Mrs. Gutierrez was rewarded with Mrs. DeLaCruz's supervisor position. Mrs. DeLaCruz suffered a patronage dismissal.

There can be no other conclusion but that plaintiff's political belief and association was a motivating factor in Mr. Pruitt's decision to terminate her. There can also be no doubt her political belief and association is arguably protected by the first amendment.

*Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), established that a non-policymaking, non-confidential government employee cannot be discharged or threatened with discharge from a job she is satisfactorily performing upon the sole ground of her political beliefs. *Id.* at 375, 96 S.Ct. at 2690. It is of no moment that the discharged employee and the discharger are members of the same political party. *Id.* at 355, 96 S.Ct. at 2680–81; *Stegmaier v. Trammell,* 597 F.2d 1027, 1031–32 n. 4 (5th Cir.1979).

In 1980, the Supreme Court reformulated the test.

> In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980).

The Seventh Circuit has stated the reasoning behind the *Elrod* rule, with its exception for policymaking or confidential

employees, as "the dismissal of public employees for reasons of political patronage violates the first amendment", *Livas v. Petka*, 711 F.2d 798, 800 (7th Cir.1983), and, "a termination based solely on an employee's political affiliation would be a deprivation of his first amendment rights to freedom of association and freedom of belief", *McClure v. Cywinski*, 686 F.2d 541, 544 (7th Cir.1982).

■ The test for determining whether the policymaker exception applies is formulated as "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Shakman, et al. v. Democratic Organization of Cook County, et al.*, 722 F.2d 1307 at 1309 (7th Cir., 1983) (*Lindsey*, Petitioner *v. Kelly*, et al., Respondents), *quoting Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981). *See also Gannon v. Daley*, 561 F.Supp. at 1382–83.

The court, in the latest *Shakman* proceeding, states the purpose behind the policymaking exception. "[The exception] is to ensure that the first amendment's protection not interfere with the workings of democratic governments and the ability of duly elected officials to implement their policies." *Shakman*, at 1310.

Mrs. DeLaCruz was given no reason for her termination at the time of discharge. She was later told it was political. Mr. Pruitt made a practice of rewarding political supporters. Mrs. Gutierrez, Mrs. DeLaCruz's replacement, was a political supporter of Mr. Pruitt. She received Mrs. DeLaCruz's position, a position for which she was not as qualified as Mrs. DeLaCruz was.

These facts and their impact are not lessened by Mr. Pruitt's testimony he did not know Mrs. DeLaCruz was the actual person in the position. This fact demonstrates Mr. Pruitt was going to dismiss whomever held the position under Dr. Arredondo and replace the employee with one of his supporters. This, again, is evidence of a political dismissal. *Cf. Nekolny*, 653 F.2d at 1172.

■ The first amendment, through the fourteenth, *see Board of Education v. Barnette*, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943), prohibits such a dismissal unless it can be shown the position was that of a policymaking or confidential nature. The evidence shows Mrs. DeLaCruz's job does not fit within the exception.

Mrs. DeLaCruz had no "meaningful input into governmental decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny*, 653 F.2d at 1170. Mr. Pruitt himself described the position of supervisor as a "more or less head bookkeeping position." Mrs. DeLaCruz had no discretion, power or authority to hire, fire or set vacation days.

She had no discretion, power or authority to make any substantive changes in tax statements; she had to refer such proposed changes to the Auditor for decision. She was told how and when to make routine changes in statements where the mistakes were either incorrect names and/or addresses or clerical errors made by the Auditor's office.

She set no policies, set no goals, attended no meetings within the Auditor's office, and performed no tasks other than the tasks she was officially instructed to perform. Political affiliation simply is not an appropriate requirement for the performance of the position of supervisor of the East Chicago office of the Lake County Auditor's office.

A case directly on point, with even seemingly stronger facts in favor of the dischargers, is *Gibbons v. Bond*, 523 F.Supp. 843 (W.D.Mo.1981), *aff'd* 668 F.2d 967 (8th Cir. 1982). *Gibbons* involved the removal and threatened removal of branch managers of the Missouri Department of Revenue. The branch managers were Democrats; the administration was Republican. The *Gibbons* court found that the discharges or threatened discharges violated the plaintiffs' first

amendment right of freedom of political belief and association.

The plaintiffs in *Gibbons* had no input into decision making, no discretion to create or change policies or goals of the Missouri Department of Revenue. The *Gibbons* court concluded:

> Branch Managers direct the sale of titles and licenses in the Bureau of Motor Vehicle and Licensing. Their office duties include, among others, supervision and evaluation of employees, preparation of an office budget, requisition of supplies and communication with the public. These are tasks which can be performed by competent Republicans, Democrats, or other persons not similarly aligned. Though defendant James stated that Branch Managers must be "emotionally committed" to the policies of the new Republican administration, the defendants did not introduce any credible evidence which showed that the plaintiffs lacked such commitment or that the plaintiffs' purported lack of commitment hampered the delivery of branch office services to the public. For these reasons, the Court is compelled to conclude that political affiliation is not now an appropriate requirement for the effective performance of the job of Branch Manager and that, as a consequence, the plaintiffs were removed or threatened with removal from their Branch Managers' jobs in violation of their First Amendment rights.

*Id.* at 852.

The Eighth Circuit affirmed the *Gibbons* result. 668 F.2d 967. The facts in *Gibbons* are stronger in the discharger's favor than the facts before this court. Mrs. DeLaCruz did not evaluate employees nor did she prepare an office budget. As stated previously, she did only what she was specifically told to do. She supervised only in the sense she was the first person with whom people communicated upon entering the office, she opened the office each day, and she took the biannual reports, compiled by all the office employees, to the Auditor's office in Crown Point.

Mrs. DeLaCruz suffered, through her termination, a deprivation of a constitutionally protected interest. She has shown her political belief and association was a substantial factor for her discharge. Having so concluded, the court must advance to the next step in analysis and ask whether plaintiff's political affiliation was the motivating factor in the termination or whether the termination would have occurred regardless of Mrs. DeLaCruz's belief.

### 2. *Political Belief and Association as the Motivating Factor in Termination.*

The Supreme Court, in *Elrod*, was not confronted with the question of what the motive was for discharge as it was stipulated and so, did not reach the issue of the burden of proof and its allocation in determining the motivation for discharge. The Supreme Court addressed and resolved the issue in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), wherein it stated:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Id.* at 287, 97 S.Ct. at 576 (footnote omitted). *See McClure v. Cywinski*, 686 F.2d 541; *Nekolny*, 653 F.2d 1164 (Seventh Circuit adoptions and applications of *Mt. Healthy*).

The preceding discussion demonstrates plaintiff has met her initial burden of proof. Her conduct, *i.e.*, her political affiliation and belief, is constitutionally protected and it was a motivating or substantial factor in her discharge. The burden

has now shifted to the defendants to show Mrs. DeLaCruz would have been terminated even in the absence of her protected conduct.

The only evidence defendants introduced to counter the assumption plaintiff's protected conduct was not only *a* motivating factor, but also *the* motivating factor, was Mr. Pruitt's testimony there were irregularities found in the bookkeeping in the East Chicago office and complaints from the public about the East Chicago branch. There was no evidence that the supervisor was responsible, generally, for any irregularities found or that Mrs. DeLaCruz was responsible, specifically, for any alleged irregularities. These irregularities and complaints were never documented or verified to the court. There is only Mr. Pruitt's statement.

■ Mr. Pruitt also made it clear he follows a practice of rewarding his political supporters. Mrs. DeLaCruz's replacement was a political supporter; Mrs. DeLaCruz was not. Mr. Pruitt hired Mrs. Gutierrez as supervisor of the East Chicago branch of the Auditor's office; Mr. Pruitt fired Mrs. DeLaCruz as supervisor. Mrs. DeLaCruz's protected activity was the motivating and substantial factor behind her discharge. Defendants have failed to carry their burden of proof.[4] *Cf. Livas v. Petka,* 711 F.2d 798.

### B

The court now addresses the second major issue. Having determined there was a deprivation of a constitutionally protected right, the issue of responsibility and liability for that deprivation arises. Was the deprivation caused by an official policy, custom or usage of Lake County which would render it liable?

The act of termination was affirmative. Plaintiff is not alleging liability exists on Lake County's part because of passive acquiescence by Lake County in the actions of its officeholder, Mr. Pruitt. Plaintiff's causal link between her deprivation and an official policy of Lake County is the allegation the decision to terminate her was ordered or decided by one whose "acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2038.

■ She must prove that causal relationship to prevail against Lake County (Mr. Pruitt in his official capacity and Lake County Council). Municipalities cannot be held liable under 1983 under a *respondeat superior* theory for the isolated torts of its employees. *Id.* at 691–92, 98 S.Ct. at 2036; *McClure,* 686 F.2d at 548; *Mui v. Dietz,* 559 F.Supp. 485, 487 (N.D.Ill.1983). *Cf. Powe,* 664 F.2d at 649–50; *Rivera v. Farrell,* 538 F.Supp. 291, 294–97 (N.D.Ill.1982).

*Monell* left open the question of just what level of officials' acts begins to constitute "acts [which] may fairly be said to represent official policy." Such a determination is necessarily fact sensitive. "At some level of authority, there must be an official whose acts reflect governmental policy, for the government necessarily acts through its agents. Thus the question becomes one of identifying the official who has authority to make policy; then liability attaches to acts performed pursuant to that policy." *Bowen v. Watkins,* 669 F.2d 979, 989 (5th Cir.1982) *quoted in Reed v. Village of Shorewood,* 704 F.2d 943, 953 (7th Cir.1983).

The Seventh Circuit has stated:

The official acts of municipal policy makers are acts of the municipality for purposes of section 1983 liability. See *Schneider v. City of Atlanta,* 628 F.2d 915, 920 (5th Cir.1980); *Black v. Stephens,* 662 F.2d 181, 191 (3d Cir.1981).

---

**4.** Defendants fail even if the court uses the test of *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), as suggested by Judge Cudahy in his concurring opinion in *Nekolny v. Painter. Nekolny v. Painter,* 653 F.2d 1164, 1173 (7th Cir. 1981) (Cudahy, J., concurring). Leaving the plaintiff with the ultimate burden of persuasion and labeling defendants' burden as intermediate does not change the conclusion reached by this court. The defendants have not produced enough evidence to show plaintiff was discharged for a legitimate, unprotected reason.

And the municipality's liability for such acts extends to acts for which the policy-making officials themselves might enjoy absolute immunity because the acts were legislative or judicial in character. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), so held with regard to the qualified immunity of municipal officers for their executive acts, and we cannot see why there should be a different result here just because these officers' immunity is absolute rather than qualified. The rationale of *Owen*, that holding the municipality liable creates incentives to avoid illegal behavior without at the same time over-deterring individuals by the threat of crushing personal liability, 445 U.S. at 655–57, 100 S.Ct. at 1417–18, applies with as much force to legislative and judicial as to the executive officers.

*Reed v. Village of Shorewood*, 704 F.2d 943, 953 (7th Cir.1983).

Other circuits have adopted this analysis and apply a test of final authority for decisions as the determining factor in deciding if an official's acts are the acts of the governing entity for purposes of section 1983 liability. *Black v. Stephens*, 662 F.2d 181 (3d Cir.1981); *Familias Unidas v. Briscoe*, 619 F.2d 391 (5th Cir.1980); *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir.1983); *Berdin v. Duggan*, 701 F.2d 909 (11th Cir.1983). *See also Landrigan v. City of Warwick*, 628 F.2d 736 (1st Cir. 1980); *Hughes v. Blankenship*, 672 F.2d 403 (4th Cir.1982). *See generally Schneider v. City of Atlanta*, 628 F.2d 915 (5th Cir.1980).

■ Applying the final authority test to these facts, the conclusion can be only that Mr. Pruitt had the final authority on personnel decisions in the Auditor's office. It was his decision as to who he would employ, not the Board of Lake County Commissioners or the Lake County Council. Lake County Council provided the funds with which Mr. Pruitt hired and paid his employees. Lake County delegated and vested final authority and discretion on the actual personnel choices to Mr. Pruitt. His decisions and acts must be viewed as the official acts of Lake County.

Indiana Code 36–2–16–4 (Burns Code Ed., Repl.1981) specifically authorizes the county auditor "to appoint one [1] first or chief deputy, and also may appoint the number of other full-time or part-time deputies and employees authorized by the county fiscal body." In light of this statute and the evidence presented at trial that Mr. Pruitt, in fact, did have final authority in personnel decisions in his office and did exercise that final authority, as a matter of law, Mr. Pruitt's acts are those of Lake County. *Cf. Van Ooteghem v. Gray*, 629 F.2d 488; *Schneider v. City of Atlanta*, 628 F.2d 915; *Berdine v. Duggan*, 701 F.2d 909; *McKinley v. City of Eloy*, 705 F.2d 1110; *Black v. Stephens*, 662 F.2d 181.

■ Mr. Pruitt in his official capacity and thus, Lake County, are liable for plaintiff's deprivation of a constitutionally protected interest. While Mr. Pruitt, individually, may be entitled to a qualified immunity based on good faith, Lake County and Mr. Pruitt officially (in reality, Lake County) do not possess and are not entitled to any qualified immunity based on good faith. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 68 L.Ed.2d 673 (1980).

### C

Mr. Pruitt, individually, is entitled to assert a good faith defense in this matter. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1973); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). However, the defense is unavailing if Mr. Pruitt's action violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738.

■ Mr. Pruitt's actions were not taken in good faith. In late 1978-early 1979, when Mr. Pruitt took his action, *Elrod v. Burns* and *Mt. Healthy* had been decided. The law was clear that patronage or political dismissals were violative of the dis-

charged employee's first amendment rights where the employee was not a policymaker.

Mr. Pruitt thought the job of supervisor as that of a head bookkeeper. He knew that it was no more than that, that the supervisor had no discretion over office functions or policies, and that the supervisor had no discretion over the other employees. As the trier of fact, this court concludes Mr. Pruitt cannot avail himself of a good faith belief Mrs. DeLaCruz was under the *Elrod* exception. She clearly was not. *Accord Nekolny v. Painter*, 653 F.2d at 1169–1170. *But see Gibbons v. Bond*, 523 F.Supp. at 853–54 (pre-*Harlow* subjective good faith test applied to similar facts, defendants found to be entitled to qualified immunity because their actions were not "malicious" and the legal conclusion of a constitutional violation was not "preordained.")[5] *See Gannon v. Daley*, 561 F.Supp. at 1388 (an issue of fact remains on good faith belief to be resolved by the trier of fact).

### III

■ There comes now the issue of damages. Plaintiff suffered an actual injury in the loss of her job. This court holds plaintiff is entitled to compensatory damages in the amount of the lost wages from January 1, 1979 until she began employment at Jones & Laughlin Steel on January 4, 1980, minus wages earned in the Sheriff's office

($344.00) and unemployment compensation received ($1,188.00). The salary for supervisor in 1979 was $9,988.50 which comes out to $192.05 per week ($9,988.50 divided by $52.00 = $192.048; $192.048 rounded to $192.05). One hundred ninety-two dollars and five cents ($192.05) divided by five days equals a wage of $38.51 per day. Mrs. DeLaCruz is entitled to compensation for the first three days of 1980 prior to her return to permanent employment on January 4, 1980 of $115.53 ($38.51 × 3 = $115.53). Thus, she is entitled to compensatory damages in the amount of $9,572.03. ($9,988.50 + $115.53 = $11,104.03 − $344.00 = $10,760.03 − $1,188.00 = $9,572.03).

■ The compensatory amount shall bear prejudgment interest from the date it fully accrued (January 4, 1980) until the date of entry of this judgment. The rate of interest shall be calculated and computed in accordance with the provisions of 28 U.S.C. § 1961 as presently enacted.

This case concerned the resolution of a federal question. Section 1961 does not bar prejudgment interest because it is silent on the question. *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988 (6th Cir.1982) and cases cited therein. *See Rodgers v. United States*, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947).

■ The awarding of prejudgment interest is within the discretion of the court

---

**5.** On very similar facts the *Gibbons* court reached the opposite conclusion on individual liability from this court's conclusion. The difference in standards applied is crucial as well as the *Gibbons* court's selective reading of *Nekolny* on this issue.

The *Gibbons* court focused on the subjective good faith as it had to do under the pre-*Harlow* test of good faith. *See Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In the interim between *Gibbons* and this decision, *Harlow* was decided, adopting a wholly objective test. *Harlow* applies to this case even though it was decided after this case went to trial. *Powe v. City of Chicago*, 664 F.2d 639, 643 n. 3 and cases cited therein. An application of an objective test of good faith renders the inescapable conclusion Mr. Pruitt is not entitled to a qualified immunity based on good faith.

Second, the *Gibbons* court selectively read *Nekolny*. The *Nekolny* court did reverse the

district court's directed verdict in favor of the plaintiffs on the issue of whether an employee/plaintiff was a policymaker. However, it did so because the facts indicated the employee may have been a policymaker and the issue should have gone to the trier of fact, *i.e.,* the jury. *Nekolny* does not say a trial court cannot find, as a matter of law, a person is not a policymaker.

This court is the trier of fact as well as the trier of law. The facts show Mr. Pruitt knew the extent and scope of the supervisor's responsibilities and duties. Mr. Pruitt also should have known about the law in this sensitive area (*Elrod, Mt. Healthy*). Finally, it is important that the *Nekolny* court, while reversing the trial court on the directed verdict, upheld the trial court's conclusion the *defendant* was individually liable, even under the subjective test of good faith.

and is based on traditional equitable principles. *Bricklayers; American Timber & Trading Co. v. First National Bank of Oregon,* 690 F.2d 781 (9th Cir.1982). The underlying purpose of awarding interest on compensatory damages is to make the wronged party whole by compensating the wronged person for being deprived of the monetary loss, *i.e.,* the money and the use of the money. *Turner v. Japan Lines, Ltd.,* 702 F.2d 752 (9th Cir.1983); *American Timber; United States v. California State Bd. of Equalization,* 650 F.2d 1127 (9th Cir.1981), *aff'd mem.* 456 U.S. 985, 102 S.Ct. 2261, 72 L.Ed.2d 864 (1982).

 Mrs. DeLaCruz has been deprived of an ascertainable amount of money damages and its use and she is entitled to recover not only the actual amount, but also the interest being earned from the use of the money. *See Argonaut Insurance Co. v. Town of Cloverdale, Indiana,* 699 F.2d 417, 421 (7th Cir.1983). Finally, prejudgment interest serves to further the congressional purposes underlying section 1983. Prejudgment interest is appropriate when it furthers the purposes of the statute in question. *Rodgers,* 332 U.S. at 373, 68 S.Ct. at 6; *Bricklayers,* 671 F.2d at 989.

 Plaintiff also requests the court to award punitive damages. Punitive damages are inappropriate except where there is wanton and willful disregard of a plaintiff's rights, there is a need to punish a defendant for outrageous conduct, or there is a need to deter a defendant and others from engaging in the same or similar conduct. *Lenard v. Argento,* 699 F.2d 874, 890 (7th Cir.1983) and cases cited therein.

 There has been no wanton and willful disregard of Mrs. DeLaCruz's rights. Mrs. DeLaCruz's first amendment right was violated and disregarded, but not maliciously or wantonly. Defendant Pruitt did not act outrageously, although he did act wrongfully and he reasonably should have known his conduct was wrong. Finally, punitive damages are not necessary to deter defendant and others from similar conduct. The compensatory damage award with prejudgment interest is sufficient to accomplish that goal. "Damages should not go beyond deterrence and become a windfall." *Lenard,* 699 F.2d at 890.[6]

IV

 Plaintiff seeks an award of attorney's fees if successful. Section 1988 of Title 42 of the United States Code so provides.[7] The court finds that costs and attorney's fees should be assessed against the defendants in this action. The considerations relevant to computing a reasonable attorney's fee award have been set forth by the United States Court of Appeals for the Seventh Circuit in *Waters v. Wisconsin Steel Works,* 502 F.2d 1309 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). The time spent by the attorney is not to be simply multiplied by a billing rate. The primary factors in the computation include not only the time reasonably spent on the case, but also the value of the attorney's work, given local legal fees, and his abilities, reputation and degree of success in the case. Also relevant is whether the attorney's efforts in this case precluded him from working on other legal matters. These factors are drawn from the sections of the Code of

---

6. Plaintiff introduced some evidence of mental and emotional distress. However, plaintiff did not specifically ask for damages for mental and emotional distress. Even assuming such evidence was meant to support an award of punitive damages, the injury has not been proven to the satisfaction of the court. *Nekolny v. Painter,* 653 F.2d at 1172, considered similar evidence and also found it lacking to support any damage award. The evidence here is simply unavailing to prove either damages for mental or emotional injury or punitive damages. *See Carey v.*

*Piphus,* 435 U.S. 247, 264, 264 n. 20, 98 S.Ct. 1042, 1052, 1052 n. 20, 55 L.Ed.2d 252 (1978).

7. Section 1988 provides, in pertinent part:
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Professional Responsibility that describe how an attorney should determine the fee he may properly charge a client, particularly DR 2–106.

While plaintiff's request for an award of attorney's fees will be granted, the court cannot at this time, on the showing before it, compute the proper amount of such an award. Plaintiff will therefore be directed to file not later than twenty (20) days from the date of this judgment a more complete breakdown and explanation of charges and time and such other material supporting the request for attorney's fees as is required by *Waters v. Wisconsin Steel Works*. The amount of such an award will be set by further order of the court. A copy of plaintiff's showing relating to attorney's fees shall be served on defendants, and defendants shall have ten (10) days from the date of filing to respond or otherwise challenge the showings and fees set forth.

### Conclusion

Plaintiff has established by a preponderance of the evidence that her discharge was a violation and deprivation of her first amendment right to freedom of political association and belief, done under color of state law by a county official acting in his official and individual capacity. Accordingly, a violation of section 1983 has been shown, thus entitling plaintiff to compensatory damages of $9,572.03 with prejudgment interest calculated and computed at the same rate as set forth for postjudgment interest in 28 U.S.C. § 1961, dating from January 4, 1980 through the date of entry of this judgment. Plaintiff shall also be entitled to costs and to attorney's fees to be awarded by further order of this court.

This memorandum of decision contains the court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1183–84 (7th Cir.1982).

### JUDGMENT ORDER

It is therefore CONSIDERED, ORDERED AND ADJUDGED that the plaintiff, Myrta DeLaCruz, recover of and from the defendants, Leslie Pruitt, individually and officially, and Lake County Council, damages in the amount of $9,572.03 plus prejudgment interest dating from January 4, 1980.

It is FURTHER ORDERED that plaintiff recover of and from the defendants attorney's fees in an amount to be set by further order of the court. Plaintiff is directed to file a more complete and explanatory statement of charges and an affidavit of counsel in support of her request for attorney's fees in a manner consistent with that set out in *Waters v. Wisconsin Steel Works*, 502 F.2d 1309 (7th Cir.1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), not later than twenty (20) days from the date of this judgment. A copy of plaintiff's showing relating to attorney's fees shall be served on defendants, and defendants shall have ten (10) days from the date of filing to respond or otherwise challenge the showing and fees set forth.